## JON-JAY TILSEN *v.* MIRIAM E. BENSON
## (SC 20664)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker and Alexander, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment dissolving his marriage
to the defendant, challenging certain of the trial court's financial orders
and claiming that the trial court had improperly denied his motion to
enforce, as a prenuptial agreement, the terms of the parties' ketubah,
which is a contract governing marriage under Jewish law. The parties
signed the ketubah shortly before they were married, and it provided
in relevant part that the defendant was to be the plaintiff's "wife
according to the laws of Moses and Israel" and that they "agreed to
divorce . . . one another . . . according to Torah law . . . ." After
marrying, the plaintiff found employment as a rabbi at a Conservative
synagogue in New Haven, where he served for nearly three decades.
During that time, the defendant, who was educated and trained as an
attorney, worked in the legal and nonprofit fields, but she had not
worked as an attorney since 2015. The defendant, however, was the
primary caregiver to the parties' children and had numerous responsibili-
ties in connection with her role as the rabbi's wife. After initiating the
present dissolution action in 2018, the plaintiff moved for an order
confirming that the ketubah was valid and enforceable, and he requested
that any asset division and support orders be entered in accordance with
Hebrew law based on the ketubah's choice of law provision. According
to the plaintiff, application of such law would result in an equal division
of marital property, excluding individual property acquired through a
gift or bequest not specifically conveyed to the other spouse, and would
preclude alimony or claims against future income. In connection with
the plaintiff's motion, the parties submitted conflicting affidavits from
various rabbis about alimony and property division under Torah law. The
trial court denied the plaintiff's motion. Applying the neutral principles
of law approach to determine whether a civil court may consider a
claim implicating a religious institution or practice without violating
the establishment clause of the first amendment to the United States
constitution, which was articulated by the United States Supreme Court
in *Jones* v. *Wolf* (443 U.S. 595), the trial court concluded that the first
amendment precluded enforcement of the ketubah's provisions. The
court reasoned that, in light of the conflicting affidavits, enforcement
of the provisions of the ketubah would require the court to choose
between competing rabbinical interpretations of the requirement that
their divorce should accord with Torah law. During the pendency of
the dissolution proceedings, the plaintiff, who was five years into a

Tilsen *v.* Benson

ten year employment contract with the synagogue, renegotiated that contract for a new, one year contract, pursuant to which he was to receive a total annual compensation package of $202,100. The synagogue, however, later informed the plaintiff that it would not be renewing his one year contract, which terminated in August, 2021. The plaintiff did not search for or intend to seek new employment. In dissolving the parties' marriage, the trial court issued several financial orders. The court found, inter alia, that the plaintiff's annual gross earning capacity was $202,100, which was consistent with his most recent compensation from the synagogue. In light of that and other findings, the trial court ordered the plaintiff to pay the defendant alimony in the amount of $5000 per month for a period of fifteen years and precluded him from seeking a modification based on the defendant's increased earnings, unless her annual gross earnings equaled or exceeded $50,000. The court also awarded the plaintiff sole possession and ownership of the marital home and 45 percent of the parties' retirement accounts, and it allowed the plaintiff to retain his ownership interest in a real estate asset established by his family members but required him to pay the defendant 25 percent of the net, after tax amount of any future distributions that he was to receive from that interest. On the plaintiff's appeal, *held*:

1. The plaintiff could not prevail on his claim that the trial court had improperly denied his motion to enforce the provisions of the ketubah on the ground that doing so would violate first amendment to the United States constitution:

   a. The trial court correctly determined that enforcement of the parties' ketubah would violate the establishment clause of the first amendment:

   The establishment clause generally precludes a court from inquiring into religious matters, but, under the neutral principles of law doctrine, civil courts may decide a dispute arising in a religious context so long as the dispute can be resolved solely by a secular legal analysis that does not implicate or is not informed by religious doctrine or practice, and, although a court resolving such a dispute may be required to examine certain religious documents, it must take special care to scrutinize those documents in purely secular terms and not to rely on religious precepts or to resolve a religious controversy.

   Given the nature of a ketubah, which resembles a contract but embraces complex religious undertones and carries spiritual weight, courts have applied the neutral principles of law doctrine to assess whether the provisions of a ketubah may be given effect in a dissolution proceeding without violating the establishment clause's prohibition against inquiring into matters of religious faith and doctrine, and this court, after reviewing the case law from those courts that have addressed the issue, found most instructive those cases that have applied the neutral principles of law doctrine in concluding that the first amendment precludes a civil

Tilsen *v.* Benson

court's enforcement of ketubah provisions similar to those in the parties' ketubah.

In the present case, the parties' ketubah was facially silent as to each party's support obligations in the event of dissolution of their marriage, the trial court would therefore have been required to determine those obligations from external sources concerning Jewish law, and the affidavits submitted by various rabbis on behalf of the parties offered conflicting opinions regarding such law as it pertains to alimony and property division, rendering the present case a paradigmatic example of entanglement that runs afoul of the establishment clause, insofar as the trial court would have been required to discern and enforce what Jewish law requires with respect to property division and financial support upon dissolution if it had given effect to the parties' ketubah.

b. The plaintiff could not prevail on his unpreserved claim that the trial court's decision not to enforce the ketubah had violated his rights under the free exercise clause of the first amendment on the ground that it prevented him from divorcing according to Jewish law:

In view of the parties' lack of agreement as to what Jewish law requires in the present case owing to the breadth and vagueness of the language in the parties' ketubah, the trial court, in making a determination as to what that law requires, would have risked violating the defendant's free exercise rights in the name of protecting those of the plaintiff.

Moreover, the trial court did not deny the plaintiff access to the court or otherwise exact a penalty in connection with his religious beliefs or practices, but, rather, its decision not to enforce the ketubah simply meant that the parties' dissolution would be governed by generally applicable principles of Connecticut law, as expressed in the equitable distribution and alimony statutes (§§ 46b-81 and 46b-82), and parties who desire specific tenets of their religious beliefs to govern the resolution of their marital dissolution actions remain free to contract for that relief via a properly executed antenuptial, postnuptial, or separation agreement that is specifically worded to express those beliefs in a way that avoids establishment clause concerns under the neutral principles of law doctrine.

2. There was no merit to the plaintiff's claims that the trial court's financial orders were based on a clearly erroneous factual finding regarding his earning capacity and that the trial court had abused its discretion in awarding alimony in the amount of $5000 per month for fifteen years and 25 percent of any future distributions in connection with the plaintiff's ownership interest in the real estate asset:

a. The trial court's finding that the plaintiff had a gross earning capacity of $202,100 was not clearly erroneous:

Tilsen *v.* Benson

Under appropriate circumstances, a trial court in a marital dissolution action may base its financial awards on a party's earning capacity, which is an amount that a person can realistically be expected to earn considering such things as the person's vocational skills, employability, age and health, rather than actual earned income, and it is especially appropriate for the court to consider whether a person has wilfully restricted his or her earning capacity to avoid support obligations.

In the present case, the trial court's decision to base the fifteen year alimony award, at least in part, on the plaintiff's earning capacity of \$202,100 was supported by the fact that the plaintiff had only recently become unemployed at the time of dissolution, the lack of any evidence as to his inability or efforts to obtain employment, and evidence that he desired to renegotiate the terms of his employment with the synagogue in order to gain an advantage in the pending dissolution action.

Moreover, there was evidence of the plaintiff's employability, including testimony from the president of the synagogue's board of trustees that the synagogue initially had no intention of replacing the plaintiff with another rabbi, and evidence that the plaintiff had declined an offer from the synagogue that would have allowed him to remain employed in a limited capacity beyond the end of the renegotiated, one year contract.

Furthermore, in the absence of evidence concerning the plaintiff's reduced employability or earning capacity resulting from his age or the termination of his employment, which the plaintiff failed to proffer, it was reasonable for the trial court to rely on the plaintiff's gross compensation for the final year of his employment with the synagogue as reflected in the one year contract, insofar as the plaintiff asked to renegotiate the ten year contract to a one year contract in March, 2020, during the pendency of the parties' dissolution action, and insofar as the trial court specifically declined to credit his testimony that the reason for doing so was because he believed that it was inappropriate to fix compensation for longer than a one year period given the uncertainties presented at that time by the start of the COVID-19 pandemic.

b. The trial court did not abuse its discretion in ordering the plaintiff to pay to the defendant 25 percent of any future distributions stemming from his ownership interest in the real estate asset:

Contrary to the plaintiff's contention that the distributions from the real estate asset are mere expectancies akin to an inheritance and, thus, not property subject to division under § 46b-81, the parties had stipulated that the distributions from that asset were property subject to equitable distribution, and the trial court's award of 25 percent of those distributions to the defendant was consistent with the present division method of deferred distribution, pursuant to which the trial court determines at the time of trial the percentage share of the nonliquid assets to which

Tilsen *v.* Benson

each spouse is entitled, and that award was not an abuse of discretion when it was viewed in the context of the court's other financial orders.

c. The trial court did not improperly based its alimony award on the plaintiff's gross earning capacity rather than on his available net income:

Although it is well settled that a court must base child support and alimony awards on the available net income of the parties, and not on gross income or gross earning capacity, this court concluded that a trial court's failure to state explicitly that an award has been based on net income, or its reference to a party's gross income or gross earning capacity, does not, in and of itself, require reversal if the trial court's decision reasonably can be understood to base the award or awards on net income, and that conclusion was consistent with the maxim that reviewing courts should presume that the trial court has exercised its discretion in accordance with the governing law.

In the present case, the trial court's only specific finding as to the plaintiff's earning capacity was expressed in terms of gross earning capacity, but the court expressly referred to the plaintiff's net weekly income as being accurately reflected in the plaintiff's financial affidavit, the court did not expressly state that the gross amount rather than the net amount furnished the basis for the alimony calculation, and, although it would have been better practice for the trial court to make an express finding with respect to the plaintiff's net earning capacity, this court could not conclude that the court's exercise of its discretion was based on a misstatement of the law.

Moreover, this court's application of the presumption that the trial court exercised its discretion in accordance with the governing law was supported by the arithmetic underlying the trial court's financial orders, as the alimony award of $5000 per month constituted approximately 37 percent of the plaintiff's net annual earning capacity, as calculated from the net weekly income reported in the plaintiff's financial affidavit, and that percentage did not indicate an abuse of discretion relative to the earning capacity on which it was based.

d. The trial court's alimony award was not an abuse of discretion when the award was viewed in light of the plaintiff's ability to pay and the defendant's earning capacity:

The alimony award was consistent with the trial court's express reliance on the reduced earning capacity of the defendant, who was earning $12 per hour at a part-time job at the time of trial, relative to that of the plaintiff, the court declined to credit expert testimony that the defendant had a much higher earning capacity given her inability to secure professional employment in the legal and nonprofit fields, and the court recognized her contributions to the marriage and the fact that those contributions aided in the plaintiff's professional success.

Tilsen *v.* Benson

Moreover, the parties' cash assets were split evenly, and the plaintiff received the marital home, 45 percent of the retirement accounts, and 75 percent of the distributions from the real estate asset, and the financial orders did not force the plaintiff to the brink of poverty by stripping him of any means with which to pay them by virtue of a disproportionate division of the marital assets.

Furthermore, the trial court expressly recognized that the parties' financial circumstances might evolve and emphasized that the alimony award was subject to modification if her yearly gross earnings were to equal or exceed $50,000.

 Argued December 15, 2022—officially released September 5, 2023

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendant filed a cross complaint; thereafter, the court, *Klau, J.*, denied the plaintiff's motion to enforce the parties' prenuptial agreement; subsequently, the court, *Goodrow, J.*, rendered judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed. *Affirmed.*

*Howard Fetner*, with whom was *Felicia C. Hunt*, for the appellant (plaintiff).

*Sarah E. Murray*, with whom was *Eric J. Broder*, for the appellee (defendant).

*Opinion*

ROBINSON, C. J. The principal issue in this appeal requires us to consider the extent to which a Connecticut court may enforce the terms of a "ketubah," which is a contract governing marriage under Jewish law,[1] without entangling itself in religious matters in violation

[1] See, e.g., L. Warmflash, "The New York Approach to Enforcing Religious Marriage Contracts: From *Avitzur* to the *Get* Statute," 50 Brook. L. Rev. 229, 232–33 and n.8 (1984); J. Solovy, Comment, "Civil Enforcement of Jewish Marriage and Divorce: Constitutional Accommodation of a Religious Mandate," 45 DePaul L. Rev. 493, 495–96 (1996).

Tilsen *v.* Benson

of the first amendment to the United States constitution. The plaintiff, Jon-Jay Tilsen, appeals[2] from the judgment of the trial court dissolving his marriage to the defendant, Miriam E. Benson. On appeal, the plaintiff contends that the trial court improperly (1) denied his motion to enforce the terms of the parties' ketubah as a prenuptial agreement on the ground that doing so would violate the first amendment, and (2) issued certain financial orders that were based on a clearly erroneous finding as to his earning capacity, were not based on his net earning capacity, and did not reflect his current financial circumstances.[3] We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts and procedural history. The parties met in Israel in 1988 and were married the next year in Pennsylvania on December 3, 1989. Their wedding ceremony was conducted in accordance with the Jewish tradition. Shortly before the marriage ceremony, in the presence of two witnesses, the parties signed their ketubah, which is a traditional Jewish marriage contract written in Hebrew and Aramaic.[4]

_____

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] All references to the trial court with respect to the plaintiff's first amendment claims, which are addressed in part I of this opinion, are to the court, *Klau*, *J*. All references to the trial court with respect to the plaintiff's challenges to the financial orders, which are addressed in part II of this opinion, are to the court, *Goodrow*, *J*.

[4] The plaintiff filed a copy of the ketubah and the following English translation, which was performed by the plaintiff himself. Although the translation was not performed by a disinterested party or a certified translator, we, like the trial court, observe that it is undisputed for purposes of this appeal.

"On the first day of the week [Sunday], the fifteenth day of the month of Kislev in the year 5750 from the creation of the world as we know it [December 3, 1989], in Wynnewood, Pennsylvania, North America:

"The groom [the plaintiff] . . . said to the first-time bride [the defendant], '[b]e my wife according to the laws of Moses and Israel, and I will honor, cherish, feed and support you according to the way of Jewish men who honor, cherish, feed and support their wives uprightly, and I give you a

Tilsen *v.* Benson

The parties moved from Israel to the United States to further the plaintiff's career opportunities as a Conservative rabbi. He found employment in the United States as the rabbi of a Conservative synagogue in New Haven, where he served for nearly twenty-eight years,

bride-price for a first-time bride of 200 silver Zuzim as is appropriate for you according to [b]iblical Law, as well as food, clothing and support and companionship in the manner of all creation'; and [the defendant], the first-time bride, declared that she will be his wife, and the dowry that she brings him from her father's estate, whether in silver or gold, jewelry, garments, household utensils or bedding, was all acceptable to [the plaintiff] in consideration for one hundred silver Zequqim;

"And the [plaintiff] added to this from his own resources an additional [one hundred] silver Zequqim corresponding to the dowry, for a total of 200 silver Zequqim;

"And thus said [the plaintiff], '[t]he obligations of this written marriage contract, the dowry, and the additional amount I accept upon myself and upon my heirs after me, that it may be collected from any or all of the best of my properties, and from any possessions that I may have anywhere, whether I own them now, at the time of collection or will acquire them in the future, from properties that are encumbered or unencumbered; all properties and possessions may be collected from for payment from me of this written marriage contract, dowry, and additional amount, even the coat off my back, during my lifetime and after my death, from this day forth and forevermore.'

"And the obligations and substance of this written marriage contract, dowry and additional amount were accepted by [the plaintiff] with the gravity of all written marriage contracts and annexes that are customarily given to Jewish women created by the authority of our sages of blessed memory.

"And [the plaintiff], our groom, and [the defendant], agreed to divorce [or, separate from] one another according to custom all the days of their life [i.e., as a continuing obligation] according to Torah law as is the manner of Jewish people. And they committed in comity and agreed to accept upon themselves the [r]abbinic [c]ourt [the Beth Din of the Rabbinical Assembly] to instruct them in the terms of Torah law and to be compassionate and [to] value one another all the days of their marriage. And each of them agreed to respond to the summons of the other to appear before [the above referenced] [r]abbinic [c]ourt, or one mutually agreed [on], to the end that both of them can live in compliance with Torah law all the days of their lives.

"This is no mere formality [or] auxiliary document. And from [the plaintiff] our groom to [the defendant], this first-time bride, and from [the defendant] this first-time bride, to [the plaintiff] our groom, was transacted all that is written and detailed above in a manner that is valid for such transactions. All is valid and effective."

Tilsen *v.* Benson

until March, 2020, when the synagogue elected not to renew his employment contract during the pendency of this action. The defendant, who is educated and trained as an attorney, worked as a Social Security disability attorney, a paralegal, and a nonprofit executive. At the time of this action, she was unemployed and had not worked as an attorney since 2015, despite efforts to find employment. While married to the plaintiff, the defendant was the primary caregiver to the parties' four children, all of whom are now adults, with the youngest reaching the age of the majority three days after the trial court rendered judgment. The defendant also assumed numerous volunteer responsibilities in connection with her role as the rabbi's wife, including hosting weekly dinners and other social events, organizing children's groups and other educational programming for the synagogue, and attending and leading certain services at the synagogue.

Based on the irretrievable breakdown of the parties' relationship with no possibility of reconciliation, the plaintiff brought this marital dissolution action in 2018. In the second amended complaint, the plaintiff sought, among other financial and custody orders, the enforcement of the parties' ketubah as a premarital agreement dated December 3, 1989. The plaintiff subsequently moved for "an order confirming that the parties' December 3, 1989 prenuptial agreement is valid and enforceable and [that] the parties' asset division and support award orders should be entered according to Hebrew law based on the valid choice of law clause found in the parties' ketubah." In that motion, which included proposed financial orders, the plaintiff argued that enforcement of the ketubah, and the application of Jewish law, would result in an equal division of marital property, excluding individual property acquired through gift or bequest not specifically conveyed to the other spouse, with no alimony or claims against future income.

347 Conn. 758 SEPTEMBER, 2023 767

Tilsen *v.* Benson

The defendant filed an objection to the plaintiff's motion to enforce the ketubah.

After a hearing, the trial court, *Klau, J.*, denied the plaintiff's motion to enforce the ketubah.[5] In its memorandum of decision, the court assumed, "without deciding, that the ketubah is otherwise a valid prenuptial agreement under Connecticut law," and it applied the "neutral principles of law" doctrine as articulated in, for example, *Jones* v. *Wolf*, 443 U.S. 595, 602–604, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), and *Thibodeau* v. *American Baptist Churches of Connecticut*, 120 Conn. App. 666, 674, 994 A.2d 212, cert. denied, 298 Conn. 901, 3 A.3d 74 (2010), to conclude that the first amendment precluded enforcement of the ketubah provision on which the plaintiff relied in support of a 50/50 division of marital property and relief from an obligation to pay alimony to the defendant. That provision states in relevant part that the parties "agreed to divorce [or, separate from] one another according to custom all the days of their life [i.e., as a continuing obligation] according to Torah law as is the manner of Jewish people. . . ." In its analysis, the trial court conducted a comprehensive review of the body of case law concerning the enforceability of various religious wedding contract provisions, including (1) the New York Court of Appeals' landmark decision in *Avitzur* v. *Avitzur*, 58 N.Y.2d 108, 446 N.E.2d 136, 459 N.Y.S.2d 572, cert. denied, 464 U.S. 817, 104 S. Ct. 76, 78 L. Ed. 2d 88 (1983), and (2) the Superior Court's decision in *Light* v. *Light*, Superior Court, judicial district of New Haven, Docket No. NNH-FA-12-4051863-S (December 6, 2012) (55 Conn. L. Rptr. 145). Observing that the parties had sub-

---

[5] The plaintiff also filed a motion to bifurcate the consideration of the ketubah issues from the underlying dissolution action. The defendant objected to that motion. The trial court denied the motion to bifurcate as moot in light of its decision to deny the plaintiff's motion to enforce the ketubah.

Tilsen *v.* Benson

mitted conflicting affidavits from rabbis about "Torah law as it pertains to alimony and property division," the trial court reasoned that enforcement of the ketubah's divorce provision would require the court to "choose between competing [rabbinical] interpretations of [the provision's] requirement that the parties' divorce should accord with 'Torah law' " and that "resolving such a dispute is precisely what the neutral principles approach forbids a court to do" under the first amendment.[6] Accordingly, the trial court denied the plaintiff's motion to enforce the ketubah.

Subsequently, the case was tried to the court, *Goodrow*, *J.*, over multiple days.[7] The trial court found that both parties were unemployed at the time of trial, that the plaintiff's then gross yearly earning capacity was $202,100, which was consistent with his final compensation from the synagogue, and that the defendant's then "gross weekly earning capacity [was] $480," which reflected her ability to secure nonprofessional, full-time employment at a wage of $12 per hour. Given those findings, which are set forth in detail in part II of this opinion, the trial court considered the statutory factors set forth in General Statutes §§ 46b-81 and 46b-82 and

_____

[6] The trial court rejected the plaintiff's attempt to analogize Torah law to that of a foreign jurisdiction for choice of law purposes, observing that "[c]onstruing the civil law of a foreign jurisdiction (other than a pure theocracy) does not require a court to choose between competing interpretations of religious law." The trial court further rejected the plaintiff's reliance on a proffered distinction within Jewish law between "laws governing the relationship between man and God and laws governing relationships between men [to avoid] the first amendment problem in this case." The trial court emphasized that "both categories of laws are rooted in the Torah and other textual sources of Jewish law. Even disputes over the correct interpretation of Jewish civil laws are disputes over the meaning and requirements of Jewish law. From the perspective of an American civil court— state or federal—such disputes are inherently religious."

[7] We note that completion of the trial in this case was delayed substantially by the onset of the COVID-19 pandemic. The proceedings began in-person and ultimately concluded using remote technology.

Tilsen *v.* Benson

rendered a judgment of dissolution with numerous financial orders, including (1) requiring the plaintiff to pay the defendant alimony in the amount of $5000 per month for a period of fifteen years, while precluding the plaintiff from seeking modification based on the defendant's increased earnings unless those "yearly gross earnings total $50,000 or more," (2) awarding the plaintiff sole possession and ownership of the marital home in New Haven, and (3) allowing the plaintiff to retain his ownership interest in Westview Park Apartments, L.P. (Westview), a real estate asset established by the plaintiff's father and uncle, but requiring him to pay the defendant 25 percent of the net, after tax amount of any distributions that he receives from that interest, including its sale. This appeal followed.

On appeal, the plaintiff claims that the trial court (1) improperly denied his motion to enforce the ketubah, and (2) abused its discretion in fashioning the various financial orders.

I

We begin with the plaintiff's claim that the trial court improperly denied his motion to enforce the ketubah. The plaintiff argues that (1) enforcement of the ketubah would not violate the establishment clause of the first amendment, and (2) failing to enforce the ketubah would violate his rights under the free exercise clause of the first amendment.

By way of background, this appeal concerns the religion clauses of the first amendment to the United States constitution, which provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., amend. I; see, e.g., *Everson* v. *Board of Education*, 330 U.S. 1, 8, 67 S. Ct. 504, 91 L. Ed. 711 (1947) (religion clauses of first amendment are made applicable to states via due process clause of fourteenth

Tilsen *v.* Benson

amendment). Compare *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1871) (declaring, as matter of federal common law, principle, "founded in a broad and sound view of the relations of church and state under our system of laws," that civil courts are to defer to religious authorities on "questions of [church] discipline, or of faith, or ecclesiastical rule, custom, or law"), with *Kedroff* v. *Saint Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 115–16, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (constitutionalizing principle from *Watson* after recognizing that it had been decided without express reference to first amendment). "A brief overview of the religion clauses of the first amendment as they [apply] to the present case may be helpful. The first amendment to the United States constitution protects religious institutions from governmental interference with their free exercise of religion." (Footnote omitted; internal quotation marks omitted.) *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 120 Conn. App. 670–71. "The first amendment [also] prohibits the excessive entanglement of government and religion." *Board of Education* v. *State Board of Education*, 243 Conn. 772, 783, 709 A.2d 510 (1998). "[T]he first amendment has been interpreted broadly to severely [circumscribe] the role that civil courts may play in resolving . . . disputes concerning issues of religious doctrine and practice. . . . Under both the free exercise clause and the establishment clause, the first amendment prohibits civil courts from resolving disputed issues of religious doctrine and practice." (Citation omitted; internal quotation marks omitted.) *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 671. "Under [the] excessive entanglement analysis . . . claims requiring courts to review and to interpret religious doctrine and practices are barred by the first amendment." (Internal quotation marks omitted.) Id.; see *Serbian Eastern Orthodox Diocese of the United*

Tilsen *v.* Benson

*States & Canada* v. *Milivojevich*, 426 U.S. 696, 697–98, 721–23, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) (holding that first amendment barred judicial consideration of bishop's wrongful discharge claim).

Before turning to the plaintiff's specific first amendment claims with respect to the enforceability of the ketubah in this case, we observe that they present questions of law over which our review is plenary. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 352–53, 246 A.3d 429 (2020), cert. denied, U.S. , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

A

We begin with the plaintiff's establishment clause claims. He argues that enforcement of the ketubah would not violate the establishment clause of the first amendment because it contains nothing more than a choice of law provision that is enforceable under the "neutral principles of law" analysis articulated by the United States Supreme Court in *Jones* v. *Wolf*, supra, 443 U.S. 602–604. Relying on, for example, *In re Marriage of Goldman*, 196 Ill. App. 3d 785, 554 N.E.2d 1016, appeal denied, 132 Ill. 2d 544, 555 N.E.2d 376 (1990) (*Goldman*), *Minkin* v. *Minkin*, 180 N.J. Super. 260, 434 A.2d 665 (Ch. Div. 1981), and *Avitzur* v. *Avitzur*, supra, 58 N.Y.2d 108, the plaintiff contends that Jewish law governing marriage is secular in nature, thus permitting a court to apply it without having to review or interpret religious doctrine in a way that would violate the first amendment. Citing *Light* v. *Light*, supra, 55 Conn. L. Rptr. 145, the plaintiff observes that our Superior Court has applied Jewish law in conjunction with dissolution judgments by enforcing a ketubah provision imposing a monetary penalty on a husband until he granted the wife a "get," or a Jewish religious divorce. See id., 146, 149 and n.1.

Tilsen *v.* Benson

In response, the defendant argues that the trial court correctly determined that enforcing the ketubah, as desired by the plaintiff, would violate the establishment clause by entangling the trial court in religious matters. The defendant contends that the ketubah cannot be enforced under the neutral principles of law doctrine because, given the "vastly conflicting" interpretations of Torah law governing marriage and divorce proffered by the parties, issuing the financial orders "would require the court to apply religious doctrine and practices and [to] inquire into religious matters . . . ." Relying on, for example, *Victor* v. *Victor*, 177 Ariz. 231, 866 P.2d 899 (App. 1993), review denied, Arizona Supreme Court (February 1, 1994), and *Aflalo* v. *Aflalo*, 295 N.J. Super. 527, 685 A.2d 523 (Ch. Div. 1996), the defendant emphasizes that "[d]istinguishing between Torah law that is religious and Torah law that is secular is inherently a question of religious law that civil courts cannot decide without running afoul of the establishment clause" because, "[i]n order to . . . make such a determination, a civil court would be required to analyze Jewish law and potentially to decide between differing interpretations of Jewish law . . . ." The defendant further contends that the cases on which the plaintiff relies, in which the husband was ordered to perform a specific act, such as appearing before a "Beth Din" (a Jewish tribunal) or issuing a get; see *In re Marriage of Goldman*, supra, 196 Ill. App. 3d 787, 791; *Minkin* v. *Minkin*, supra, 180 N.J. Super. 261; *Avitzur* v. *Avitzur*, supra, 58 N.Y.2d 112–13; are distinguishable because the parties' obligations under Jewish law were facially clear from the ketubah or otherwise were not disputed. We agree with the defendant and conclude that the trial court correctly determined that enforcement of the ketubah in this case would violate the establishment clause of the first amendment.

The establishment clause's preclusion against inquiring into religious matters has been described broadly

Tilsen *v.* Benson

as the "ecclesiastical abstention doctrine"; *McRaney* v. *North American Mission Board of the Southern Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020), cert. denied, U.S. , 141 S. Ct. 2852, 210 L. Ed. 2d 961 (2021); and it was first articulated by the United States Supreme Court in *Watson* v. *Jones*, supra, 80 U.S. (13 Wall.) 727, which was a church property dispute. See, e.g., *Ball* v. *Ball*, 250 Ariz. 273, 279, 478 P.3d 704 (App. 2020); *Episcopal Church in the Diocese of Connecticut* v. *Gauss*, 302 Conn. 408, 422–24, 28 A.3d 302 (2011), cert. denied, 567 U.S. 924, 132 S. Ct. 2773, 183 L. Ed. 2d 653 (2012); see also *Our Lady of Guadalupe School* v. *Morrissey-Berru*, U.S. , 140 S. Ct. 2049, 2061, 207 L. Ed. 2d 870 (2020) (describing "church autonomy" doctrine with respect to governance matters and supervision and selection of clergy).

In considering whether a civil court may consider a claim implicating a religious institution or practice without violating the establishment clause, courts often apply the "neutral principles of law" doctrine articulated by the United States Supreme Court in *Jones* v. *Wolf*, supra, 443 U.S. 602–604, which, like *Watson*, was a church property dispute. Under the neutral principles approach, a court resolving a dispute arising in a religious context may be required "to examine certain religious documents, such as a church constitution," but "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts" or "to resolve a religious controversy . . . ." Id., 604. This court has concluded that "the neutral principles of law approach is preferable [to the hierarchical approach of *Watson* v. *Jones*, supra, 80 U.S. (13 Wall.) 725–27], because it provides the parties with a more level playing field, and the outcome in any given case is not preordained in favor of the general church, as happens in practice under the hierarchical approach. Moreover, as the court explained in *Jones* [v. *Wolf*,

Tilsen *v.* Benson

supra, 603], the neutral principles approach is completely secular and relies exclusively on objective, well established concepts of trust and property law familiar to lawyers and judges.'' (Internal quotation marks omitted.) *Episcopal Church in the Diocese of Connecticut* v. *Gauss*, supra, 302 Conn. 429; see *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 120 Conn. App. 673–74; see also *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449–50, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (relying on neutral principles of law approach in concluding that ''[t]he departure-from-doctrine element of the implied trust theory'' under Georgia law of property dispute resolution violated first amendment). Put differently, the neutral principles of law doctrine permits civil courts to decide disputes arising in religious contexts, so long as they may be resolved solely by a secular legal analysis that does ''not implicate or [is] not informed by religious doctrine or practice.''[8] *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 674.

[8] We note that, in its recent decision in *Kennedy* v. *Bremerton School District*, U.S. , 142 S. Ct. 2407, 2427–28, 213 L. Ed. 2d 755 (2022), the United States Supreme Court overruled the formerly well established entanglement analysis of *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–13, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1971), pursuant to which a challenged governmental action, such as a policy or statute, would be upheld if it (1) had ''a secular legislative purpose,'' (2) had a ''principal or primary effect . . . that neither advances nor inhibits religion,'' and (3) did ''not foster an excessive government entanglement with religion.'' (Internal quotation marks omitted.) *Board of Education* v. *State Board of Education*, supra, 243 Conn. 783–84. ''In time, [the *Lemon*] approach also came to involve estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion.'' *Kennedy* v. *Bremerton School District*, supra, 2427. Concluding that the *Lemon* approach had created ''warring'' rather than '' 'complementary' '' purposes among the three clauses of the first amendment, namely, the establishment, free exercise, and free speech clauses; id., 2426; the United States Supreme Court instead adopted an establishment clause analysis that abandons what it deems to be *Lemon*'s '' 'ambitiou[s]' '' overreach; id., 2427; and requires consideration of the ''original meaning'' of the establishment clause and ''reference to historical practices and understandings'' to determine whether a practice violates the

347 Conn. 758 SEPTEMBER, 2023 775

Tilsen *v.* Benson

In addition to tort, property, and employment cases,[9] the broad first amendment preclusion against inquiring into matters of religious faith and doctrine has been applied in the family law context. Courts have applied the neutral principles of law doctrine to assess the

establishment clause. (Internal quotation marks omitted.) Id., 2428. Neither the parties' briefs nor our independent research reveals any authority indicating that the recent sea changes to the United States Supreme Court's establishment clause jurisprudence affect the continuing vitality of the neutral principles of law doctrine, and we continue to follow it in this case. See, e.g., *Belya* v. *Kapral*, 45 F.4th 621, 625, 630 and n.8 (2d Cir. 2022) (noting broad applicability of neutral principles of law approach from *Jones* v. *Wolf*, supra, 443 U.S. 602–604, in case concerning church autonomy doctrine as defense to defamation claims brought by priest against church), cert. denied sub nom. *Synod of Bishops of the Russian Orthodox Church Outside of Russia* v. *Belya*, U.S. , 143 S. Ct. 2609, L. Ed. 2d (2023).

[9] For examples of the application of the neutral principles of law doctrine in tort, property, and employment cases, compare *McRaney* v. *North American Mission Board of the Southern Baptist Convention, Inc.*, supra, 966 F.3d 347, 349 (first amendment did not require dismissal of claims of intentional interference with business relationships, defamation, and intentional infliction of emotional distress, despite fact that they were asserted against religious organizations, because plaintiff was "not challenging the termination of his employment" or "asking the court to weigh in on issues of faith or doctrine"), *Malicki* v. *Doe*, 814 So. 2d 347, 352, 364 (Fla. 2002) (claims of negligent hiring and supervision arising from sexual abuse by priest concerned "a neutral principle of tort law," namely, foreseeability of harm to third parties), and *Connor* v. *Archdiocese of Philadelphia*, 601 Pa. 577, 579, 624–25, 975 A.2d 1084 (2009) (first amendment did not bar defamation case arising from expulsion of student from parochial school because "neutral principles" of state law applied to determination of whether school's statements that student brought weapon to school were defamatory), with *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 120 Conn. App. 669, 689 (first amendment barred claims of defamation, breach of contract, and negligent infliction of emotional distress because they concerned plaintiff's fitness for ordination and placement as minister), and *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, 78 Conn. App. 865, 877–78, 829 A.2d 38 (first amendment barred negligent infliction of emotional distress claims in connection with marital advice given by church elders that was "contrary to [the] teachings of the Jehovah's Witnesses"), cert. denied, 266 Conn. 931, 837 A.2d 805 (2003); see also *Serbian Eastern Orthodox Diocese of the United States & Canada* v. *Milivojevich*, supra, 426 U.S. 717–18, 724–25 (concluding that state courts violated first amendment by considering merits of bishop's claim that he was defrocked arbitrarily in violation of church tribunal's procedures).

Tilsen *v.* Benson

permissibility of a desired remedy under the first amendment, including whether the provisions of a Jewish couple's ketubah may constitutionally be given effect in a civil proceeding to dissolve the couple's marriage. This constitutional question is inherent in the nature of the ketubah because, although it "resembles a contract in many ways, its formation and impact sport complex religious undertones. The [k]etubah defines a husband's marital estate and child support obligations, but its role in a sanctified marriage process gives it spiritual weight. Although some clauses are reminiscent of a prenuptial agreement, anachronistic wording and allegiance to the [law] of Moses offer spiritually intertwined responsibilities." (Footnote omitted.) L. Traum, Note, "Involved, Empowered and Inspired: How Mediating Halakhic Prenuptial Agreements Honors Jewish and American Law and Builds Happy Families," 17 Cardozo J. Conflict Resol. 179, 182 (2015). In considering the enforceability of a ketubah by the civil courts, we must also be mindful that, although religious and civil marital privileges and obligations may overlap, including as to matters of dissolution, our state courts may provide relief only in the civil sphere. See, e.g., *Hames* v. *Hames*, 163 Conn. 588, 590–91, 594–96, 316 A.2d 379 (1972) (concluding that parties' second marriage was voidable when performed under remarriage ceremony that complied with Catholic canon law, which did not recognize parties as divorced, but was inconsistent with General Statutes § 46-3, now General Statutes § 46b-22, which governs solemnization of marriages); see also id., 594–95 (observing that "[r]eligious doctrines notwithstanding, the parties were legally divorced, not merely legally separated, by force of a decree binding on all the world as to the existence of their status," and that, "even if canon law should deny the authority of the state to dissolve a marriage, religious doctrine could not nullify the decrees of our courts" (internal quotation marks omitted)).

347 Conn. 758 SEPTEMBER, 2023 777

Tilsen *v.* Benson

The leading case on this point—and the only one from a state high court—is the decision of the New York Court of Appeals in *Avitzur* v. *Avitzur*, supra, 58 N.Y.2d 108. Although the parties in *Avitzur* had previously obtained a civil divorce judgment, a woman "is not considered divorced and may not remarry pursuant to Jewish law, until such time as a Jewish divorce decree, known as a '[g]et', is granted. In order that a [g]et may be obtained [the husband and wife] must appear before a 'Beth Din,' a rabbinical tribunal having authority to advise and pass [on] matters of traditional Jewish law."[10] Id., 112. The wife in *Avitzur* "sought to summon [the husband] before the Beth Din pursuant to the provision of the [k]etubah recognizing that body as having authority to counsel the couple in the matters concerning their marriage." Id. The husband "refused to appear before the Beth Din, thus preventing [the wife] from obtaining a religious divorce." Id. The wife then brought an action for breach of contract, claiming that "the [k]etubah constitutes a marital contract, which [the husband had] breached by refusing to appear before the Beth Din," and seeking "specific performance of the [k]etubah's requirement that he appear before the Beth Din." Id. The majority of the New York Court of Appeals concluded that the parties, "in signing the [k]etubah, [had] entered into a contract [that] formed the basis for their marriage," with "the terms of this marital contract" obligating the husband, "at [the wife's] request, [to] appear before the Beth Din for the

---

[10] We note that the Beth Din is also called a "Bet Din," "Beit Din," or "Bais Din." See, e.g., I. Breitowitz, "The Plight of the *Agunah*: A Study in *Halacha*, Contract, and the First Amendment," 51 Md. L. Rev. 312, 319 and n.20 (1992); J. Zitter, Annot., "Application, Recognition, or Consideration of Jewish Law by Courts in United States," 81 A.L.R.6th 1, 30, § 4 (2013). It is a "Jewish rabbinical court, usually composed of three rabbis. A [Beth] Din is commonly used to decide business disputes . . . and is needed in order to secure a religious divorce. [When] there is a dispute between two Jews, they are supposed to turn to the [Beth] Din before going to regular courts." (Footnote omitted.) J. Zitter, supra, 81 A.L.R.6th 30, § 4.

Tilsen *v.* Benson

purpose of allowing that tribunal to advise and counsel
the parties in matters concerning their marriage, includ-
ing the granting of a [g]et.'' Id., 113. The court empha-
sized that the wife was ''not attempting to compel [the
husband] to obtain a [g]et or to enforce a religious practice
arising solely out of principles of religious law. She
merely [sought] to enforce an agreement made by [the
husband] to appear before and [to] accept the decision
of a designated tribunal.'' Id.

The majority in *Avitzur* then rejected the husband's
argument that ''enforcement of the terms of the [k]etu-
bah by a civil court would violate the constitutional
prohibition against excessive entanglement between
church and [s]tate, because the court must necessarily
intrude [on] matters of religious doctrine and practice.
It [was] urged that the obligations imposed by the [k]et-
ubah arise solely from Jewish religious law and can be
interpreted only with reference to religious dogma.''
Id., 114. Acknowledging ''the religious character of the
[k]etubah''; id.; the majority applied the neutral princi-
ples of law approach from *Jones* v. *Wolf*, supra, 443
U.S. 602–603, and concluded that the first amendment
''permit[ted] judicial involvement to the extent that
[enforcement of the ketubah could] be accomplished
in purely secular terms.'' *Avitzur* v. *Avitzur*, supra, 58
N.Y.2d 115. The court held that ''the relief sought by
[the wife was] . . . simply to compel [the husband] to
perform a secular obligation to which he contractually
bound himself. In this regard, no doctrinal issue
need[ed] [to] be [addressed], no implementation of a
religious duty [was] contemplated, and no interference
with religious authority [would] result. Certainly noth-
ing the Beth Din [could] do would in any way affect
the civil divorce. To the extent that an enforceable
promise [could] be found by the application of neutral
principles of contract law, [the wife would] have dem-
onstrated entitlement to the relief sought.'' Id. The court

Tilsen *v.* Benson

emphasized that "[c]onsideration of other substantive issues bearing [on the wife's] entitlement to a religious divorce . . . [was] appropriately left to the forum the parties chose for resolving the matter." Id., 115–16.

We agree with the *Avitzur* majority that, in principle, parties should be permitted to elect to have dissolution disputes arbitrated in an alternative forum, albeit one that is religious in orientation, in situations in which it is possible to enforce such an agreement without "[c]onsideration of other substantive issues bearing [on an] entitlement to a religious divorce . . . ." Id., 115. *Avitzur*, however, was a 4-3 decision of the New York Court of Appeals; id., 121; and, on the whole, we find more persuasive the dissenting opinion in *Avitzur*, which deemed it impossible for a court to disentangle secular from religious considerations in adjudicating the dispute at hand. See id., 118–19 (Jones, J., dissenting). The dissent agreed that the inquiry was governed by the neutral principles of law doctrine but ultimately disagreed with the majority's conclusion that, on the specific facts of that case, "courts may discern one or more discretely secular obligations [that] may be fractured out of the '[k]etubah,' indisputably in its essence a document prepared and executed under Jewish law and tradition." Id., 116 (Jones, J., dissenting). The dissent determined that "even a definition of the purported 'secular obligation,' " namely, to appear before the Beth Din, "requires an examination into the principles and practice of the Jewish religion," especially given the parties' apparent disagreement as to the scope of the Beth Din's authority to summon the husband in that particular case. Id., 119 (Jones, J., dissenting); see id., 120 (Jones, J., dissenting). We deem particularly significant the dissent's observation that the "unsoundness" of the majority's position is demonstrated by the wife's reliance on a rabbi's affidavit as to the Beth Din process and its authority, meaning that—

Tilsen *v.* Benson

as with the plaintiff's claims in this case—"substantiation of her position . . . depend[ed] on expert opinion with respect to Jewish law and tradition.'' Id., 120 (Jones, J., dissenting). In our view, requiring the court to go beyond the four corners of the document at issue in order to determine what Jewish law requires is a paradigmatic example of entanglement that runs afoul of the establishment clause.[11]

For the same reason, we disagree with the decision of the Illinois Court of Appeals in *Goldman*, on which the plaintiff relies heavily in this case. See *In re Marriage of Goldman*, supra, 196 Ill. App. 3d 785. In *Goldman*, the Illinois court upheld a trial court's order requiring a husband to take the steps necessary to provide his wife with a get in connection with their civil divorce. See id., 791–95, 797. In *Goldman*, the parties' ketubah was similar to the ketubah in the present case, insofar as it provided that the marriage would be " 'according to the law[s] of Moses and Israel,' " without specifically addressing the topic of dissolution in any way. Id., 787; see footnote 4 of this opinion. Despite this vague language, the Illinois court deferred to the trial court's factual finding that the parties intended the ketubah to be a contract to govern their marriage according to Orthodox Jewish law, rather than to serve "merely as poetry or art in connection with the marriage ceremony.'' *In re Marriage of Goldman*, supra, 792. The court also noted the uncontradicted testimony of two

_____

[11] On this point, we note that cases concerning the enforcement of Mahr agreements, which enforce a groom's financial obligation to care for his bride under Islamic law, are similarly instructive under the neutral principles of law doctrine. See, e.g., *Nouri* v. *Dadgar*, 245 Md. App. 324, 335, 351–52, 226 A.3d 797 (2020) (Mahr requiring provision of gold coins and Quran may be enforced "if its secular terms are enforceable under neutral principles of contract law,'' and antenuptial contract analysis governed its validity as matter of state law); *Odatalla* v. *Odatalla*, 355 N.J. Super. 305, 312–13, 810 A.2d 93 (Ch. Div. 2002) (Mahr requiring payment of $10,000 was enforceable under neutral principles of law).

347 Conn. 758 SEPTEMBER, 2023 781

Tilsen *v.* Benson

Orthodox Jewish rabbis that Jewish law required the husband to grant the wife a get in the event of divorce and that that process was "secular rather than religious in nature" as a matter of Jewish law. Id., 790; see id., 793–94. The court relied on, among other cases, *Avitzur* v. *Avitzur*, supra, 58 N.Y.2d 108; see *In re Marriage of Goldman*, supra, 795; and concluded that ordering the husband to provide a get was consistent with the neutral principles of law doctrine because it had "the secular purpose of enforcing a contract between the parties" and expedited the resolution of the civil divorce proceedings, insofar as, "[w]ithout the get, [the wife] was prohibited by her religious beliefs from remarrying. It would have been detrimental to the parties and their children to leave the get issue unresolved." Id., 794. Particularly given the reliance by the *Goldman* majority on expert testimony to discern what Jewish law required in that case, we instead find the *Goldman* dissent more persuasive. The dissent concluded that it would violate the first amendment to order the husband to provide the wife a get because construction of the vague ketubah language "required the court to partake in evaluation, investigation and interpretation of religious dogma," and compelled the husband's "involvement in an act of religious worship."[12] Id., 799 (Johnson, J., dissenting);

_____

[12] Given the persuasive dissent in *Goldman*; see *In re Marriage of Goldman*, supra, 196 Ill. App. 3d 797–800 (Johnson, J., dissenting); we acknowledge, but disagree with, those courts that have followed the reasoning of the *Goldman* majority, along with the *Avitzur* majority opinion, and specifically enforced ketubah provisions or otherwise ordered husbands to provide their wives with a get in connection with civil divorce proceedings. See *Scholl* v. *Scholl*, 621 A.2d 808, 810–13 (Del. Fam. 1992) (concluding that enforcement of stipulation specifically requiring husband to obtain get did not violate first amendment and relying on rabbis' testimony in concluding that husband violated that stipulation by failing to obtain Orthodox get desired by wife, despite lack of language in stipulation specifying required nature of get); *Schneider* v. *Schneider*, 408 Ill. App. 3d 192, 201–203, 945 N.E.2d 650 (concluding that *Goldman* supported trial court order directing husband to provide wife with get in upholding trial court's award of attorney's fees to wife as sanction for husband's filing of frivolous pleading), appeal denied, 955 N.E.2d 480 (Ill. 2011); *Minkin* v. *Minkin*, supra, 180 N.J.

Tilsen *v.* Benson

see P. Finkelman, "A Bad Marriage: Jewish Divorce and the First Amendment," 2 Cardozo Women's L.J. 131, 149–50 (1995) (criticizing *Goldman* because "a secular court [was] trying to determine what is religious law . . . what is the 'law[s] of Moses and Israel,' " which "lead[s] precisely to the kind of entanglement with religion that American courts have historically rejected").

Thus, we find more instructive those cases that have applied the neutral principles of law doctrine to conclude that the first amendment precludes a civil court's enforcement of ketubah provisions similar to those in the present case. For example, in *Victor* v. *Victor*, supra, 177 Ariz. 231, the parties had entered into a ketubah, similar to the one in the present case, which provided in relevant part that "the parties will comply with the 'laws of Moses and Israel' . . . ." Id., 232. The husband

Super. 262, 264–66 and n.4 (crediting testimony of Orthodox rabbis that providing get is secular act, over contrary testimony of Reform rabbi, in concluding that "the entry of an order compelling [the husband] to secure a get" pursuant to broad "Moses and Israel" ketubah language did not violate first amendment because it "would have the clear secular purpose of completing a dissolution of the marriage" and does "not require the husband to participate in a religious ceremony or to do acts contrary to his religious beliefs"); *Burns* v. *Burns*, 223 N.J. Super. 219, 223–26, 538 A.2d 438 (Ch. Div. 1987) (taking judicial notice of Encyclopedia Judaica and Bible and requiring husband to go to Beth Din to obtain get for wife because evidence indicated that husband was not refusing to provide get due to sincerely held religious belief, insofar as he had already remarried and was demanding $25,000 from wife in settlement negotiations as condition for providing get); *Mishler* v. *Mishler*, Docket No. 05-21-00067-CV, 2022 WL 2352952, *1, *3–4 (Tex. App. June 30, 2022) (applying neutral principles of law doctrine and concluding that enforcement of dissolution agreement requiring wife to accept get did not violate first amendment because her delay in meeting with rabbis for ceremony was result of COVID-19 hesitation and was not religiously based refusal). But cf. *In re Marriage of Katsap*, Docket No. 2-21-0706, 2022 WL 3038429, *19–20 (Ill. App. August 2, 2022) (distinguishing *Goldman* and declining to enforce ketubah that purportedly required husband to pay $1 million to wife because of lack of "reasonable terms established, according to expert testimony, as pertaining to Jewish law," and because of unconscionability, given husband's minimal assets and income).

Tilsen *v.* Benson

in *Victor* repeatedly refused the wife's request for a get, and she asked the court to order the husband to grant her one in connection with the civil dissolution proceedings. Id. The Arizona Court of Appeals rejected the wife's reliance on *Avitzur* and *Goldman*, among other cases, for the proposition that "the ketubah itself, which obligates the parties to live in accordance with the moral precepts of Jewish law, is a premarital contract that can be specifically enforced as would be the case in any other type of settlement between litigants." (Internal quotation marks omitted.) *Victor* v. *Victor*, supra, 233. Analyzing the ketubah as an antenuptial agreement, the court concluded that "the only specific provisions in the ketubah relate[d] to financial obligations" and rejected the wife's reliance on its "language that the parties [would] comply with the 'laws of Moses and Israel.' " Id., 234. The court held that "[s]uch a vague provision has no specific terms describing a mutual understanding that [the] husband would secure a Jewish divorce. . . . If [the] court were to rule on whether the ketubah, given its indefinite language, includes an unwritten mandate that a husband under these circumstances is required to grant his wife a get, [the court] would be overstepping [its] authority and assuming the role of a religious court. This [the court] decline[d] to do. [The court held] . . . as a matter of law, [that] the ketubah [did] not constitute an enforceable antenuptial agreement."[13] (Citation omitted.) Id.

A New Jersey trial court decision, *Aflalo* v. *Aflalo*, supra, 295 N.J. Super. 527, is similarly instructive. In that case, the husband sought to compel the wife to appear before a Beth Din to facilitate their potential

---

[13] Given this conclusion as to the language of the ketubah, the Arizona court did not reach the separate issue of "whether enforcement by a court of such a provision [specifically promising the granting of a get in a premarital or separation agreement] would violate the [f]irst [a]mendment." *Victor* v. *Victor*, supra, 177 Ariz. 234.

Tilsen *v.* Benson

reconciliation, and the wife sought an order directing the husband to provide her with a get. Id., 530–31. Citing the United States Supreme Court's decision in *Serbian Eastern Orthodox Diocese of the United States & Canada* v. *Milivojevich*, supra, 426 U.S. 696, the court disagreed with an earlier New Jersey trial court decision, *Minkin* v. *Minkin*, supra, 180 N.J. Super. 263–66, ordering a husband to provide his wife with a get, on which the plaintiff relies in the present case. See *Aflalo* v. *Aflalo*, supra, 538; see also footnote 13 of this opinion. The court in *Aflalo* deemed the court's "conclusion [in *Minkin*] that an order requiring the husband to provide a 'get' is not a religious act [and does not involve] the court in the religious beliefs or practices of the parties [to be] not at all convincing. It is interesting that the court [in *Minkin*] was required to choose between the conflicting testimony of the various rabbis to reach this conclusion. *The one way in which a court may become entangled in religious affairs, which the court in Minkin did not recognize, was in becoming an arbiter of what is 'religious.'*" (Emphasis added; footnote omitted.) *Aflalo* v. *Aflalo*, supra, 538. The court in *Aflalo* also rejected the conclusion that the enforcement of the ketubah "concerned purely civil issues" because the prohibition on remarrying without a get affects only a desire to marry another Jewish person, meaning that the order of a get "directly affected the religious beliefs of the parties. By entering the order, the court empowered the wife to remarry in accordance with her religious beliefs and also similarly empowered any children later born to her. The mere fact that the 'get' [did] not contain the word 'God,' which the court in *Minkin* found significant, [was] hardly reason to conclude otherwise."[14] Id., 538–39; see also *Sieger* v. *Sieger*, 37 App.

_____

[14] The New Jersey court also observed in *Aflalo* that the provision of the get must be voluntary as a matter of Jewish law and that requiring the provision of the get under penalty of contempt of court would, in essence, overrule the authority of the Beth Din. See *Aflalo* v. *Aflalo*, supra, 295 N.J. Super. 539–40; see also id., 540–41 (endorsing *Avitzur* approach of using

Tilsen *v.* Benson

Div. 3d 585, 586–87, 829 N.Y.S.2d 649 (2007) (declining to review wife's claim that Beth Din order obtained by husband, "which allowed him to remarry without first giving the wife a 'get,' " did not comply with New York statute that "prevent[s] the husband in the case of a Jewish divorce from using the denial of a 'get' as a form of economic coercion in a civil divorce action," because that claim "would require the court to review and interpret religious doctrine and [to] resolve the parties' religious dispute, which the court [was] proscribed from doing under the [f]irst [a]mendment entanglement doctrine").

Turning to the record in the present case, we conclude that the plaintiff's desired relief violates the establishment clause under the neutral principles of law doctrine. Most significant, the parties' ketubah is facially silent as to each spouse's support obligations in the event of dissolution of the marriage, thus leaving the court to determine those obligations from external sources as to Jewish law, namely, the parties' expert witnesses, whose proffered opinions differed in this case, instantly alerting the court as to the establishment clause dilemma. This renders the present case distinct from *Avitzur*, in which—under the majority's view of the record—the contested portion of the ketubah was more akin to a typical arbitration clause, insofar as it facially required only the submission of the case to the specific Beth Din and did not require the court to discern and enforce what Jewish law requires with respect to property division and financial support upon dissolution. See *Avitzur* v. *Avitzur*, supra, 58 N.Y.2d 113–15. Making that determination, especially in the presence of conflicting

_____

Beth Din as alternative dispute resolution forum). Ultimately, the court in *Aflalo* observed that "*Minkin* . . . conjures the unsettling vision of future enforcement proceedings"; id., 541; and that the "spectre of [the husband's] being imprisoned or surrendering his religious freedoms because of action by a civil court is the very image [that] gave rise to the [f]irst [a]mendment [issue]." Id., 542.

Tilsen *v.* Benson

rabbinical opinions, would render this case a textbook entanglement into religious matters, right to the threshold question of whether those obligations are indeed "religious" in the first instance. See *Victor* v. *Victor*, supra, 177 Ariz. 234; *Aflalo* v. *Aflalo*, supra, 295 N.J. Super. 538–40; *Sieger* v. *Sieger*, supra, 37 App. Div. 3d 586–87; see also *Davis* v. *Scher*, 356 Mich. 291, 302–304, 97 N.W.2d 137 (1959) (applying express trust doctrine to resolve property dispute between factions of Orthodox Jewish congregation on basis of uncontroverted evidence at trial that "the teaching of Orthodox Judaism" precludes mixed gender seating); *Fisher* v. *Congregation B'nai Yitzhok*, 177 Pa. Super. 359, 363–65, 110 A.2d 881 (1955) (deferring to findings of trial court "that the parties contracted on the common understanding that the defendant was an [O]rthodox synagogue [that] observed the mandate of the Jewish law as to separate [gender] seating" during High Holiday season, and rabbi's statement on that point was not used to establish truth of matter asserted but to show contracting parties' intent). We conclude, therefore, that the establishment clause of the first amendment precludes the relief sought by the plaintiff.

B

We next address the plaintiff's claim that the trial court's decision not to enforce the ketubah violated his rights under the free exercise clause of the first amendment because it prevented him from divorcing according to Jewish law, as the parties had agreed. Relying on *Espinoza* v. *Montana Dept. of Revenue*, U.S. , 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020), and *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, U.S. , 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017), the plaintiff also argues that the trial court violated his free exercise rights by denying him a generally available benefit, namely, the enforcement of a prenuptial agreement, as a result of the parties' choice of Torah law to

Tilsen *v.* Benson

govern that agreement. Citing *In re Landis*, 5 Ohio App. 3d 22, 23, 448 N.E.2d 845 (1982), in which the trial court enforced a separation agreement providing that the husband would pay for his children's tuition at a Christian school, the plaintiff contends that the trial court's decision has the effect of using the establishment clause to violate the parties' freedom of contract and free exercise of religion.

In response, the defendant observes that the plaintiff's free exercise claim irreconcilably conflicts with his establishment clause arguments that Jewish law on this point is not religious. The defendant also argues that the plaintiff's claim is unpreserved and not reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[15] because the lack of a finding as to whether the plaintiff's position that Torah law should govern the dissolution of his marriage is a "sincerely held" religious belief renders the record inadequate for review. Finally, the defendant contends that, even if we deem his claim reviewable under *Golding*, there is no violation of a constitutional right because the trial court assumed the validity under Connecticut law of the ketubah as a prenuptial agreement yet determined that enforcing it would have required it to violate

[15] Under *Golding*, a "party can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . . The test set forth in *Golding* applies in civil as well as criminal cases." (Citations omitted; internal quotation marks omitted.) *Gleason* v. *Smolinski*, 319 Conn. 394, 402 n.10, 125 A.3d 920 (2015).

the establishment clause by deciding contested issues of religious doctrine. Citing *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, supra, 393 U.S. 449, and *Jones* v. *Wolf*, supra, 443 U.S. 606, the defendant also emphasizes that the trial court's decision did not preclude the parties from obtaining a religious divorce, or from otherwise negotiating a civil dissolution—via a prenuptial, postnuptial or settlement agreement—the terms of which are consistent with Jewish law. Reviewing the plaintiff's unpreserved claim under *Golding*, we conclude that he has failed to prove that the trial court's decision not to enforce the ketubah violated his rights under the free exercise clause.

The plaintiff's free exercise claim implicates the "play in the joints between what the [e]stablishment [c]lause permits and the [f]ree [e]xercise [c]lause compels." (Internal quotation marks omitted.) *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, supra, 137 S. Ct. 2019; see, e.g., *Everson* v. *Board of Education*, supra, 330 U.S. 3, 16 (rejecting establishment clause challenge to state law enabling school district to reimburse parents for transportation costs for sending children to public and private schools, including parochial schools, because barring use of transportation funds for parochial schools would penalize those parents for exercise of their faith). "The [f]ree [e]xercise [c]lause protect[s] religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status. . . . Applying that basic principle, [the United States Supreme] Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." (Citation omitted; internal quotation marks omitted.) *Trinity Lutheran Church*

Tilsen *v.* Benson

*of Columbia, Inc.* v. *Comer*, supra, 2019. "[T]he [f]ree
[e]xercise [c]lause protects against indirect coercion or
penalties on the free exercise of religion, not just out-
right prohibitions." (Internal quotation marks omitted.)
Id., 2022. "[T]he liberties of religion and expression may
be infringed by the denial of or placing of conditions
[on] a benefit or privilege." (Internal quotation marks
omitted.) Id.; see *Espinoza* v. *Montana Dept. of Reve-
nue*, supra, 140 S. Ct. 2261 (Montana constitution's cate-
gorical ban on use of state supported educational
scholarship funds for religious schools violated free
exercise rights of both religious schools and families
who desired to have their children attend them); *Trin-
ity Lutheran Church of Columbia, Inc.* v. *Comer*, supra,
2024–25 (concluding that free exercise clause barred
Missouri constitution's categorical exclusion of other-
wise qualified church operated schools and day care
centers from eligibility for state grant funds for play-
ground resurfacing). When the United States Supreme
Court "has rejected free exercise challenges, the laws
in question have been neutral and generally applicable
without regard to religion. [It has] been careful to distin-
guish such laws from those that single out the religious
for disfavored treatment." *Trinity Lutheran Church of
Columbia, Inc.* v. *Comer*, supra, 2020; see, e.g., *Employ-
ment Division, Dept. of Human Resources* v. *Smith*,
494 U.S. 872, 874, 877–78, 110 S. Ct. 1595, 108 L. Ed. 2d
876 (1990) (Native American church members were not
entitled to dispensation from generally applicable crimi-
nal narcotics laws).

Taking into account the plaintiff's sincerely held reli-
gious beliefs for purposes of the first prong of *State* v.
*Golding*, supra, 213 Conn. 239–40, we conclude that he
has failed to prove that the trial court's decision not to
enforce the ketubah penalized his free exercise rights,
causing his unpreserved claim to fail under the third
prong of *Golding*. See footnote 15 of this opinion. Partic-

ularly in view of the parties' lack of agreement as to what Jewish law requires in the present case given the breadth of the ketubah's language, making this determination as to the applicable Jewish law—untenable in any event under the neutral principles of law doctrine— would have risked a violation of the defendant's free exercise rights in the name of protecting those of the plaintiff. See *In re Landis*, supra, 5 Ohio App. 3d 25 (observing that acceptance of husband's argument that enforcing separation agreement requiring him to pay tuition for specific religious school violates establishment clause would be "counterbalanc[ed]" by "the rights afforded [to the wife] under the [f]ree [e]xercise [c]lause, including the right as custodial parent to determine whether the parties' children [would] attend a parochial, secular, private or public school"); J. Solovy, Comment, "Civil Enforcement of Jewish Marriage and Divorce: Constitutional Accommodation of a Religious Mandate," 45 DePaul L. Rev. 493, 530 (1996) (describing "the inherent conflict in the [f]ree [e]xercise [c]lause" as "the dilemma resulting from the court's obligation to choose to protect one party's free exercise rights at the expense of the other party's rights" (internal quotation marks omitted)). Put differently, enforcement of this vaguely worded ketubah in the guise of protecting the plaintiff's free exercise rights would have put the trial court on the horns of an establishment clause dilemma.

Second, the trial court did not deny the plaintiff access to the court or otherwise exact some kind of penalty in connection with his religious beliefs or practices; its decision simply meant that this dissolution action would be governed by generally applicable principles of Connecticut law as expressed in our alimony and equitable distribution statutes. Parties who desire specific tenets of their religious beliefs to govern the resolution of marital dissolution actions remain free to

contract for that relief via a properly executed antenup-
tial, postnuptial, or separation agreement that is specifi-
cally worded to express those beliefs in a way that
avoids establishment clause concerns under the neutral
principles of law doctrine.[16] Compare *In re Landis*,
supra, 5 Ohio App. 3d 28 (concluding that "enforcement
of a separation agreement, supported by consideration,
between the parents of a minor child, requiring the
noncustodial parent to pay tuition for [the child's] atten-
dance . . . at a religiously oriented school, either spec-
ified in the agreement or selected by the custodial
parent, violates neither the [e]stablishment [c]lause nor
the [f]ree [e]xercise [c]lause of the [f]irst [a]mend-
ment"), with *Ball* v. *Ball*, supra, 250 Ariz. 279–81 (trial
court violated first amendment by hearing evidence,
including testimony from ministers and documentary
evidence comparing religious tenets, to decide whether
father's Mormon religion was "part of the Christian
faith" for purposes of assessing compliance with parent-
ing plan). We conclude, therefore, that the trial court's

---

[16] A great deal of the commentary in this area focuses on the potential
use of Jewish law principles to influence civil divorce decrees. These com-
mentators urge parties seeking a divorce according to Jewish law principles
to execute, in accordance with applicable state laws, prenuptial agreements,
the four corners of which are facially consistent with the desired Jewish
law in a way that avoids interpretation by the state court, including by using
a Beth Din as an alternative dispute resolution forum. See, e.g., I. Breitowitz,
"The Plight of the *Agunah*: A Study in *Halacha*, Contract, and the First
Amendment," 51 Md. L. Rev. 312, 419–21 (1992); M. Greenberg-Kobrin, "Civil
Enforceability of Religious Prenuptial Agreements," 32 Colum. J. L. & Soc.
Probs. 359, 393–94 (1999); L. Warmflash, "The New York Approach to Enforc-
ing Religious Marriage Contracts: From *Avitzur* to the *Get* Statute," 50
Brook. L. Rev. 229, 253 (1984); cf. J. Haberman, Note, "Child Custody: Don't
Worry, a Bet Din Can Get It Right," 11 Cardozo J. Conflict Resol. 613, 639–41
(2010) (suggesting use of "Beth Din of America" prenuptial agreement and
arbitration clauses referring matters, including child custody disputes, to
Beth Din for decision that would consider both Jewish law and secular best
interest of child standard); see also *Grabe* v. *Hokin*, 341 Conn. 360, 371–74,
267 A.3d 145 (2021) (considering enforceability of antenuptial agreements
under both General Statutes § 46b-36g and *McHugh* v. *McHugh*, 181 Conn.
482, 436 A.2d 8 (1980)).

Tilsen *v.* Benson

denial of the plaintiff's motion to enforce the ketubah did not violate his rights under the free exercise clause of the first amendment. Accordingly, the trial court properly denied the plaintiff's motion to enforce the ketubah.

II

We next address the plaintiff's challenges to the trial court's financial orders. The record reveals the following additional facts, as found by the trial court, and procedural history relevant to these claims. The parties have lived separately since 2019; the plaintiff remains in the marital home in New Haven, while the defendant resides in a rental apartment. At the time of dissolution, the plaintiff was fifty-nine years old and was "educated, trained, and employed as a rabbi." The plaintiff had held the same position as a rabbi at a Conservative synagogue in New Haven for nearly twenty-eight years. While trial was pending, in March, 2020, he renegotiated his prior, ten year employment contract, which commenced on July 1, 2015 (2015 contract), with a termination date of August 14, 2025. The 2015 contract set a similarly structured schedule of compensation over the first five years of the term and provided that the plaintiff and the synagogue would commence negotiations with respect to compensation for the second five years of that term by June 15, 2019, and complete them by December 31, 2019. During the pendency of trial, the plaintiff renegotiated the 2015 contract for a new, one year contract (2020 contract), with a termination date of August, 2021. His total compensation under the 2020 contract was $202,100, which was divided into components for base salary, parsonage payment, retirement benefits, and medical insurance payments. The plaintiff had "complete control over the various components" of his compensation and could "reallocate" them as he

Tilsen *v.* Benson

desired.[17] The plaintiff received no compensation for giving up the last five years of the 2015 contract. In January, 2021, the board of directors of the synagogue informed the plaintiff that it would not renew the one year 2020 contract because he had refused to address certain concerns of the congregation with respect to ritual observances during the COVID-19 pandemic that the board had identified in a survey. The plaintiff has not searched for new employment and does not intend to seek further employment. The trial court found that this conduct demonstrated "an effort by the plaintiff to reduce his financial liability to the [defendant] in the wake of this [marital] dissolution . . . action." The trial court further found that the plaintiff's then gross earning capacity was $202,100, which reflects the value of the 2020 contract.

With respect to the defendant, the trial court found that, at the time of dissolution, she was sixty-one years old and was "educated and trained as an attorney." The defendant was unemployed at the time of trial and had not worked as an attorney since 2015. The trial court found that, despite her "extraordinary efforts" to find employment, the defendant had been unsuccessful and continued to receive "unemployment compensation

[17] Specifically, the plaintiff contracted for a base salary of $58,100, a parsonage allowance of $72,000, pension and retirement account contributions of $45,000, reimbursement of professional expenses, such as dues, subscriptions and travel, in the amount of $7000, and medical insurance premiums for him and his family in the amount of $20,000. The synagogue also agreed (1) to pay the standard employer's share of Social Security and Medicare, (2) to contribute up to $1000 annually to a life insurance policy for the plaintiff, the defendant, or both, (3) to pay the premium for a disability insurance policy for the plaintiff, and (4) to admit the plaintiff, his spouse, and family members as guests to synagogue programs and services.

In contrast to the 2020 contract, the 2015 contract permitted the plaintiff to reallocate *all* of the various components of his total compensation as he wished, "as long as the sum total of those items [was] not affected and such reallocation and redesignation [was] made and reported consistent with all applicable tax and other laws."

and [to earn] minimal funds as an infrequent babysitter.'' The trial court found that the defendant had been very supportive of the plaintiff during their marriage, as she was ''the main caregiver responsible for raising the parties' [four] children'' and also assumed numerous social and educational duties in her capacity as the ''rabbi's wife,'' which ''greatly enhanced the plaintiff's standing within the religious community, and his financial success in his long-term employment as a rabbi.'' Observing that she carried out this role for approximately twenty-four years ''without compensation for the duties she performed,'' the trial court found that these ''volunteer efforts increased the earning capacity of the [plaintiff] at the expense of the defendant's own earning capacity. Rather than perform all of the duties of the rabbi's wife . . . without pay, [the defendant] could have been devoting her time and efforts to her own career as an attorney or as an administrator with a nonprofit entity.'' Accordingly, the trial court ''reject[ed] the plaintiff's testimony that the defendant, in essence, did not contribute to the plaintiff's career as a rabbi.'' Crediting ''some, but not all,'' of the testimony of Jeffrey D. Joy, a vocational rehabilitation counselor presented as an expert witness by the plaintiff, the trial court found that the defendant's ''gross weekly earning capacity [was] $480,'' which reflected her ability to secure nonprofessional, full-time employment at a wage of $12 per hour.[18]

_____

[18] The trial court rejected Joy's testimony that the defendant had a gross yearly earning capacity in a range of $54,000 to $69,000, given the positions that she had held as a Social Security disability attorney, paralegal, and nonprofit director. The court credited the defendant's testimony and found that, despite her ''extraordinary efforts . . . she [was then] unable . . . to obtain employment as a Social Security disability attorney, a paralegal, or a director for a not-for-profit organization. Although the court [was] hopeful that the defendant [would] be able to secure employment in the future in one of these positions, the court [found] that the defendant [was] unable to . . . obtain such employment.'' The trial court further declined to credit Joy's testimony that ''the defendant's age would not be a substantial limiting factor in her ability to obtain professional employment.''

Tilsen *v.* Benson

Given those findings, the trial court considered the statutory factors set forth in §§ 46b-81 and 46b-82 and issued numerous financial orders. First, the court ordered the plaintiff to pay the defendant alimony in the amount of $5000 per month for a period of fifteen years, with the plaintiff precluded from seeking modification based on the defendant's increased earnings, "unless [her] yearly gross earnings total $50,000 or more."

Turning to property division, the trial court awarded the plaintiff sole possession and ownership of the marital home in New Haven, which it valued at $273,500.[19] The court then found that the plaintiff "possesse[d] an ownership interest in Westview . . . from which he [had] received yearly distributions since approximately 1997; the amount of the distributions [had] varied. Westview . . . was established in 1994 by [family members of the plaintiff]. The funds received by the parties from the [Westview] distributions were used as part of the parties' regular budget, particularly for retirement savings. The court [found] that the annual distributions [were] not mere expectancies but constitute[d] marital property subject to division." The court ordered that the plaintiff would retain his interest in Westview but must pay the defendant 25 percent of the net, after tax amount of any distributions that he received from that ownership interest, including its sale.

With respect to the parties' various financial accounts, the trial court evenly divided the parties' bank and brokerage accounts. The court also awarded the defendant 55 percent and the plaintiff 45 percent of the parties' various retirement accounts. The court ordered that a

[19] The trial court ordered the plaintiff to refinance the mortgage to remove the defendant from any liability with respect to the mortgage and to pay her a stipulated amount of $41,829 as her share of the home's equity, along with an additional payment of $24,250, which was one-half of the additional appreciation of the home's stipulated fair market value during the dissolution proceedings.

Tilsen *v.* Benson

Bank of America financial liability listed on the defendant's financial affidavit be paid equally by both parties. Finally, the court ordered that existing college savings accounts created for the benefit of the parties' two older children be used toward the educational expenses of the remaining minor child, and ordered the plaintiff to pay 75 percent, and the defendant 25 percent, of any remaining postmajority educational expenses up to the "University of Connecticut cap" amount provided by General Statutes § 46b-56c (g).[20]

Before turning to the plaintiff's specific challenges to the financial orders, we observe that the "standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the

_____

[20] With respect to ancillary orders, the trial court ordered the parties to maintain their own health and medical insurance and to pay their own attorney's fees. Finally, the court ordered the plaintiff to maintain life insurance in the amount of $500,000 for the benefit of the defendant, for so long as he has an alimony obligation or an educational expense obligation for the minor child. The court also granted the defendant entitlement to the yearly tax credit for dependency for the minor child.

Tilsen *v.* Benson

entire evidence is left with the definite and firm conviction that a mistake has been committed.'' (Internal quotation marks omitted.) *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 464, 165 A.3d 1124 (2017).

Further, ''[w]e have repeatedly recognized that [i]n determining the assignment of marital property under § 46b-81 or alimony under § 46b-82, a trial court must weigh the station or standard of living of the parties in light of other statutory factors such as the length of the marriage, employability, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income.'' (Internal quotation marks omitted.) Id., 467. Particularly with respect to alimony, the ''trial court does not need to give each factor equal weight or make express findings as to each factor, but it must consider each factor. . . . In addition, it is a long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards. . . . Finally, the trial court's financial orders must be consistent with the purpose of alimony: to provide continuing support for the nonpaying spouse, who is entitled to maintain the standard of living enjoyed during the marriage as closely as possible. . . . When exercising its broad, equitable, remedial powers in domestic relations cases, a court must examine both the public policy implicated and the basic elements of fairness.'' (Citations omitted; internal quotation marks omitted.) *Oudheusden* v. *Oudheusden*, 338 Conn. 761, 769, 259 A.3d 598 (2021).

Accordingly, we now turn to the plaintiff's claim that the financial orders are (1) based on a clearly erroneous factual finding as to his earning capacity, and (2) an abuse of discretion, insofar as the trial court awarded the defendant alimony in the amount of $5000 monthly for a fifteen year period and 25 percent of any future Westview distributions.

A

We begin with the plaintiff's claim that the trial court's financial orders are based on a clearly erroneous factual finding, namely, that he has a gross "earning capacity of $202,100 for fifteen years." Citing, among other cases, *Weinstein* v. *Weinstein*, 280 Conn. 764, 911 A.2d 1077 (2007), the plaintiff contends that the there was no evidence regarding his employability and likely future compensation following the synagogue's decision not to renew his employment contract. The plaintiff further argues that the trial court incorrectly found that he had voluntarily terminated his employment contract through the year 2025 without consideration insofar as it lacked terms of compensation, rendering it unenforceable. The plaintiff also argues that, when the trial court found that the defendant's age is "a substantial limiting factor in her ability to obtain professional employment," it erroneously failed to make a coordinate finding regarding the plaintiff's "ability to obtain employment in light of his age," which is only two years less than that of the defendant.

In response, the defendant cites *Schmidt* v. *Schmidt*, 180 Conn. 184, 429 A.2d 470 (1980), *Boyne* v. *Boyne*, 112 Conn. App. 279, 962 A.2d 818 (2009), and *Hart* v. *Hart*, 19 Conn. App. 91, 561 A.2d 151, cert. denied, 212 Conn. 813, 565 A.2d 535 (1989), and argues that the trial court properly used the plaintiff's final gross compensation in the amount of $202,100 as a basis for its finding as to his earning capacity, particularly given the trial court's "explicit" discrediting of his testimony and its finding that he had made efforts to diminish his earnings in an attempt to influence his anticipated alimony obligation. Noting that the plaintiff did not raise issues concerning the enforceability of his contract at trial, the defendant emphasizes that there was ample evidence of the plaintiff's future employability, including the efforts of the synagogue to engage in a routine renegoti-

Tilsen *v.* Benson

ation of his compensation under the 2015 contract, which would have kept him employed through 2025 had he not "maneuvered out of" it during trial. We agree with the defendant and conclude that the trial court properly exercised its discretion when it relied on the plaintiff's earning capacity in issuing its financial orders and that its finding that he had a gross earning capacity of \$202,100 was not clearly erroneous.

In considering the statutory factors governing alimony, child support, and the equitable distribution of marital property; see General Statutes §§ 46b-81 and 46b-82; it "is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount [that] a person can theoretically earn, nor is it confined to actual income, but rather it is an amount [that] a person can realistically be expected to earn considering such things as his [or her] vocational skills, employability, age and health." (Citation omitted; internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 280 Conn. 772; see, e.g., *Tanzman* v. *Meurer*, 309 Conn. 105, 113–14, 70 A.3d 13 (2013). Although "we never have required a finding of bad faith before imputing income based on earning capacity"; *Weinstein* v. *Weinstein*, supra, 772; "[w]hen determining earning capacity, it . . . is especially appropriate for the court to consider whether [a person] has wilfully restricted his [or her] earning capacity to avoid support obligations." (Internal quotation marks omitted.) *Tanzman* v. *Meurer*, supra, 114; see, e.g., *Schmidt* v. *Schmidt*, supra, 180 Conn. 189–90; see also *Boyne* v. *Boyne*, supra, 112 Conn. App. 283 ("when a person is, by education and experience, capable of realizing substantially greater earnings simply by applying himself or herself, the court has demonstrated a willingness to frame its orders on

Tilsen *v.* Benson

capacity rather than actual earnings'' (internal quotation marks omitted)). Finally, ''when a trial court has based a financial award . . . on a party's earning capacity, the court must determine the specific dollar amount of the party's earning capacity.'' *Tanzman* v. *Meurer*, supra, 117. Awards of alimony and support that are based on earning capacity must be supported by evidence that includes ''specific amounts'' of past earnings, or of vocational evidence as to ''the typical salary'' of the imputed party's occupation considering that party's ''ability and experience.'' *Schmidt* v. *Schmidt*, supra, 190–91.

We conclude that the trial court's finding that the plaintiff had a gross earning capacity of \$202,100, which formed the basis for the fifteen year alimony order, was not clearly erroneous. First, the recency of the plaintiff's unemployment, along with the lack of any evidence as to inability or efforts to obtain employment and evidence of his desire to renegotiate the terms of his employment to gain an advantage in this litigation, supports the trial court's decision to make an award based on his earning capacity. See *Boyne* v. *Boyne*, supra, 112 Conn. App. 282–84 (trial court did not commit clear error in finding that husband had earning capacity of \$100,000 per year, even though ''he was unemployed at the time of the dissolution, and his average income for the prior three years was approximately \$41,000,'' because he was licensed electrical engineer, his last annual salary in that position was \$100,000, with earnings as high as \$127,000, and his unsuccessful ongoing job search did ''not necessarily mean that his earning capacity [had] been diminished''); *Elia* v. *Elia*, 99 Conn. App. 829, 833–35, 916 A.2d 845 (2007) (trial court did not commit clear error in concluding that husband's earning capacity was greater than his actual income because of evidence that he voluntarily left his construction foreman position, and that wife's earning capacity

Tilsen *v.* Benson

was less than her income at trial because she had failed to pass practical nursing examination, which resulted in change to her employment classification); *Hart* v. *Hart*, supra, 19 Conn. App. 94 (in calculating child support and alimony, trial court properly relied on husband's $39,000 salary in his last position as quality control engineer, rather than his $8000 in earnings each year since leaving that position for cutting lawns, when he had "had only two job interviews for quality control positions" in two year period, meaning that he had "a demonstrated earning capacity much greater than his actual earned income").

Indeed, evidence of the plaintiff's employability was provided by the testimony of Yaron Lew, the president of the synagogue's board of trustees. Lew testified that the synagogue initially had no intention of replacing the plaintiff; in an email to the plaintiff urging him to begin the compensation renegotiation process under the 2015 contract for the second five years, Lew stated that the board did not anticipate "any issues with the extension of the contract" because the synagogue was "not looking to replace [its] beloved [r]abbi . . . ." Indeed, even after the termination of the 2020 contract, the plaintiff declined an offer that would have allowed him to remain employed beyond the end of the 2020 contract, to lead High Holiday services, and then to receive a farewell celebration of his tenure and service to the synagogue. Further, the plaintiff testified at trial that he was contemplating retirement following the expiration of the 2020 contract in August, 2021, and had not yet initiated a search for a new position.[21]

_____
[21] The plaintiff testified that he had not decided whether to seek new employment as a Conservative rabbi following the expiration of his contract in August, 2021, given the likely implications of finding a new position, including the likelihood of having to relocate from the New Haven area and that a job search would likely take place through the placement services of the Conservative movement's Rabbinical Assembly.

Moreover, in the absence of vocational evidence as to his reduced employability or earning capacity resulting from his age or the termination of his employment[22]— which the plaintiff himself could have, but did not, proffer—the trial court reasonably relied on his total contracted gross compensation of $202,100 from the final year of his employment with the synagogue, commencing on July 1, 2020, and terminating on August 14, 2021, which was allocated across different components, including base salary, retirement benefits, and a parsonage allowance. See footnote 17 of this opinion. Reliance on that final gross amount for earning capacity was supported by the fact that the plaintiff asked the synagogue to renegotiate the ten year, 2015 contract to this one year contract on March 30, 2020, which was during the pendency of this action. Indeed, the trial court specifically declined to credit the plaintiff's testimony that he renegotiated the 2015 contract to a one year term because he believed that it was inappropriate to attempt to fix compensation for longer than a one year period given the economic uncertainty and difficulty presented by the start of the COVID-19 pandemic in March, 2020. To the contrary, Lew, the president of the synagogue's board, testified about unsuccessful efforts to get the plaintiff to negotiate the terms of his compensation for

_____

[22] We disagree with the plaintiff's argument that the trial court improperly considered the defendant's age in assessing vocational evidence as to her earning potential but did not do the same for him. First, in contrast to the defendant, who was unemployed after having held numerous positions in the legal and nonprofit arenas, the plaintiff had a more stable and recent work history. Given the recency of the plaintiff's unemployment at the time of trial, and the fact that he had not decided whether to seek a new position or to retire, the trial court reasonably relied on his previous earnings in determining his earning capacity. Accordingly, consideration of the defendant's age in assessing her earning capacity did not ipso facto render the trial court's determination as to the plaintiff's earning capacity clearly erroneous. To the extent that the plaintiff's age may later be deemed to interfere with any subsequent efforts to obtain employment, he remains free to file a motion for modification and to argue a substantial change in circumstances. See General Statutes § 46b-86 (a).

Tilsen *v.* Benson

the second half of the 2015 contract in accordance with that agreement's compensation clause, but that the plaintiff had indicated in January, 2020, that he desired a one year term and reduced flexibility across compensation categories on the advice of counsel during the pendency of this litigation. See *Steller* v. *Steller*, 181 Conn. App. 581, 590–92, 187 A.3d 1184 (2018) (trial court's finding that dentist had earning capacity less than his current income was "amply justified" given his age and plans to reduce his work schedule in light of settlement agreement that contemplated retirement at age of sixty-five, and his neck and back ailments following forty years of dental practice); see also id., 593–95 (finding as to reduced gross earning capacity was not supported by evidence because it accounted only for wage income and not other income sources); cf. *Schmidt* v. *Schmidt*, supra, 180 Conn. 190–91 (reversing alimony and child support order based on husband's earning capacity as commodities broker, despite evidence that he had "earned a substantial income in the past," because "there was no evidence of the [husband's] past salary as a commodities broker, or of the typical salary of a commodities broker of the [husband's] ability and experience" (footnote omitted)). Accordingly, we conclude that the trial court's finding that the plaintiff had a gross earning capacity of $202,100 was not clearly erroneous.

B

We next address the plaintiff's claims that the trial court abused its discretion in issuing certain financial orders that "have no basis in [his] current financial circumstances," including orders that he pay the defendant (1) 25 percent of any distributions that he receive from the Westview apartment trust, and (2) alimony in the amount of $5000 per month for fifteen years.[23]

[23] Under the well established mosaic theory; see, e.g., *Oudheusden* v. *Oudheusden*, supra, 338 Conn. 777–78; the plaintiff also challenges the trial court's related orders that (1) awarded the defendant 55 percent of the

Tilsen *v.* Benson

1

We begin with the plaintiff's Westview claims. The plaintiff relies on *Bender* v. *Bender*, 258 Conn. 733, 785 A.2d 197 (2001), *Bornemann* v. *Bornemann*, 245 Conn. 508, 752 A.2d 978 (1998), and *Rubin* v. *Rubin*, 204 Conn. 224, 527 A.2d 1184 (1987), and contends that the Westview distributions are "mere expectancies," akin to an inheritance, which is not property subject to division under § 46b-81 because he was a limited partner in Westview, with no management role and no enforceable right to receive any distributions. The plaintiff also challenges the trial court's failure to attach a present value to the Westview distributions and its decision instead to award the defendant 25 percent of those distributions in perpetuity. In response, the defendant argues that the trial court's division of the Westview distributions is consistent with the parties' stipulation characterizing them as property, as well as the plaintiff's then existing right to share in Westview's profits as a limited partner, the regularity with which he received those distributions during the parties' marriage, and the "present division method of deferred distribution" of assets, as described in *Bender*. We agree with the defendant and conclude that the trial court did not abuse its discretion in ordering the plaintiff to pay to the defendant 25 percent of his Westview distributions.

parties' retirement accounts, (2) he pay the defendant $66,079 in connection with the distribution of the marital residence, and (3) he pay 75 percent of the minor child's college expenses. In response, the defendant contends that the plaintiff's claims with respect to the retirement accounts, the buyout of the marital residence, and the college expenses are not reviewable because they are inadequately briefed. Nevertheless, although the plaintiff does not specifically challenge these orders on their individual merits, we acknowledge that granting appellate relief with respect to his alimony and Westview distribution claims necessarily would require that the other orders, which are "interwoven," be reexamined on remand as part of creating a new "mosaic . . . ." (Internal quotation marks omitted.) *Morris* v. *Morris*, 262 Conn. 299, 307, 811 A.2d 1283 (2003).

Tilsen *v.* Benson

Having reviewed the record, we observe that the parties stipulated before trial that, although they disagreed as to the value of the plaintiff's interest in Westview,[24] they agreed that "the [plaintiff's] interest in [Westview was] not directly transferable to the [defendant]" and that, "[w]ith respect to any distributions of any kind that are received by the [plaintiff], the court shall have the right to make a determination as to what portion/ percentage of such distributions the [defendant] is entitled. . . . [I]n their respective proposed orders, the [defendant] claim[ed] [that] she [was] entitled to 50 [percent] and the [plaintiff] claim[ed] [that] she [was] entitled to zero."[25] The parties further agreed that, if the court were to order "any sharing of the [Westview] distribution(s) as contemplated herein, the [plaintiff] shall not be ordered to buy out the [defendant's] interest in [Westview] as part of the distribution at the time of the divorce; rather, within ten . . . days of the [plaintiff's] receipt of any payment/distribution of any kind from [Westview], he shall pay to the [defendant] her appropriate share of such payment/distribution." According to the plaintiff's financial affidavit, at the time of trial, he received income from Westview distributions in the amount of $433 gross weekly, although statements and tax documents concerning his Westview

––––––––––
[24] The defendant's expert witness valued the plaintiff's interest in Westview "and any related entities or affiliates thereto . . . at $753,000," and the plaintiff's expert witness valued it at $589,000.

[25] The parties also stipulated: (1) "If the court orders any sharing of the distribution(s) as contemplated herein, the parties agree that they shall share in any capital call, expenses, taxes or any such liability related thereto. The sharing of said costs shall be in proportion to the sharing of the distribution as ordered by the court." And (2) "[s]hould the court order a sharing of the distribution as contemplated herein, for any calendar year in which the [plaintiff] is obligated to pay the [defendant] a portion of the distributions from [Westview], he shall provide to the [defendant] copies of K-1 forms and any documents pertaining to receipt of any [Westview] distributions. [The plaintiff] shall provide said documents to [the defendant] quarterly, i.e., March 31, June 30, September 30, and December 31."

Tilsen *v.* Benson

interest indicated that those distributions fluctuated annually in amount.

Given the parties' stipulation that the Westview distributions are property subject to equitable distribution,[26] we conclude that the trial court did not abuse its discretion in awarding the defendant 25 percent of those distributions. This award is consistent with the "present division method of deferred distribution," which, along with "the present value method, also called the immediate offset method . . . and . . . the reserved jurisdiction

---

[26] To the extent that the plaintiff challenges the trial court's conclusion that the Westview distributions are property subject to equitable distribution because they are not mere expectancies, we disagree. Although the plaintiff is a limited partner with no managerial control over any distributions, the trial court's conclusion is grounded in its unchallenged findings that the parties have regularly received the Westview distributions since 1997 and have relied on them as part of their budget, particularly as a source of retirement savings. These findings establish that the plaintiff's interest in the Westview distributions is, "as a practical matter . . . sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender*, supra, 258 Conn. 749; see *Mickey* v. *Mickey*, 292 Conn. 597, 628, 974 A.2d 641 (2009) ("*Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely"); see also *Mickey* v. *Mickey*, supra, 630–31 (husband's interest in disability retirement benefits was "far too speculative to be considered property subject to equitable distribution" because it was contingent on disability occurring prior to age or service requirement, and "[a] potential disability is, by its very nature, an accidental event that every employee and employer strives to avoid"); *Bender* v. *Bender*, supra, 749–50 (unvested pension benefits were property under § 46b-81, with "any uncertainty regarding vesting . . . more appropriately handled in the valuation and distribution stages, rather than in the classification stage"); *Bornemann* v. *Bornemann*, supra, 245 Conn. 517–19 (unvested stock options were property under § 46b-81, despite contingencies on their exercise at later dates, because they created enforceable right); cf. *Simmons* v. *Simmons*, 244 Conn. 158, 162, 170, 708 A.2d 949 (1998) (medical degree earned by spouse during marriage was not property under § 46b-81 because it was only opportunity to earn future income, rendering it "a mere expectancy" interest); *Rubin* v. *Rubin*, supra, 204 Conn. 236–39 (expected inheritance was too speculative to be property under § 46b-81).

Tilsen *v.* Benson

method,'' is one of ''three general approaches to address the problems of valuation and distribution'' of nonliquid assets, such as pension benefits. *Bender* v. *Bender*, supra, 258 Conn. 754; see id., 754–61 (providing detailed description of three general approaches); id., 761–62 (''expressly reject[ing] . . . the reserved jurisdiction method'' as inconsistent with statutory scheme governing dissolution of marriage).

''Under the present division method, the trial court determines at the time of trial . . . the percentage share of the [nonliquid assets] to which the nonemployee spouse is entitled. . . . In other words, the court will declare that, upon maturity, a fixed percentage of the pension be distributed to each spouse.'' (Internal quotation marks omitted.) Id., 758; see, e.g., *Ingles* v. *Ingles*, 216 Conn. App. 782, 807–10, 286 A.3d 908 (2022) (given absence of evidence as to present value, trial court was not required to calculate present value of pensions when it utilized present division method and ordered each party to retain 100 percent interest in their own pension); *Kent* v. *DiPaola*, 178 Conn. App. 424, 440–41, 175 A.3d 601 (2017) (trial court did not improperly fail to credit testimony of husband's pension actuary as to present value of pensions because court had discretion to use present division method of valuation and distribution). Thus, viewed in the context of the remainder of the financial orders, the trial court did not abuse its discretion in awarding the defendant 25 percent of the future Westview distributions.

2

Finally, we turn to the plaintiff's alimony claims. First, citing, among other cases, *Greco* v. *Greco*, 275 Conn. 348, 880 A.2d 872 (2005), and *Pellow* v. *Pellow*, 113 Conn. App. 122, 964 A.2d 1252 (2009), the plaintiff argues that (1) the alimony award was unduly punitive relative to his limited resources, (2) the award failed to consider

Tilsen *v.* Benson

his "lack of income after losing the only job he had held for twenty-eight years and his prospects of obtaining comparable employment in the future," particularly given his age, and (3) the trial court did not adequately explain the justification for its fifteen year duration. The plaintiff also contends that the trial court violated well established case law requiring that the alimony award be based on his available net income, rather than his gross income or earning capacity. See, e.g., *Morris* v. *Morris*, 262 Conn. 299, 306, 811 A.2d 1283 (2003); *Langley* v. *Langley*, 137 Conn. App. 588, 600–601, 49 A.3d 272 (2012); *Cleary* v. *Cleary*, 103 Conn. App. 798, 801–802, 930 A.2d 811 (2007).

In response, the defendant argues that the trial court did not abuse its discretion in issuing the alimony order. First, she relies on the Appellate Court's decisions in *Fronsaglia* v. *Fronsaglia*, 202 Conn. App. 769, 246 A.3d 1083 (2021), and *Leonova* v. *Leonov*, 201 Conn. App. 285, 242 A.3d 713 (2020), cert. denied, 336 Conn. 906, 244 A.3d 146 (2021), in support of the proposition that the trial court's failure to expressly state that it considered the plaintiff's net income does not mandate reversal, especially given the court's express consideration of the statutory factors and the fact that the memorandum of decision indicated that the plaintiff's net income was "accurately reflected in [his] financial affidavit." The defendant then argues that the $5000 monthly award was not an abuse of discretion because there was no evidence that the plaintiff could not find employment commensurate with his earning capacity, and the evidence demonstrated instead that the plaintiff had—at the time of trial—elected not to search for new employment. She also emphasizes that, during the marriage, her supportive and expansive role in the synagogue community as the rabbi's wife led to an increase the plaintiff's earning capacity "at the expense of her own . . . ." See, e.g., *Hornung* v. *Hornung*, 323 Conn. 144,

Tilsen *v.* Benson

162, 146 A.3d 912 (2016). Finally, the defendant cites cases such as *Watrous* v. *Watrous*, 108 Conn. App. 813, 816, 949 A.2d 557 (2008), and argues that, because the alimony order was approximately 37 percent of the plaintiff's net income as consistent with his gross earning capacity, it was not an abuse of discretion in the context of the parties' thirty year marriage, particularly because it was time limited and modifiable in comparison to the lifetime awards that have been upheld in similar cases. We agree with the defendant and conclude that the trial court did not abuse its discretion in ordering the plaintiff to pay the defendant alimony in the amount of $5000 per month for fifteen years.

a

We begin with the plaintiff's contention that the trial court improperly based its alimony award on his gross earning capacity, rather than the net amount. "It is well settled that a court must base child support and alimony orders on the available net income of the parties, not gross income." *Morris* v. *Morris*, supra, 262 Conn. 306; see, e.g., *Tobey* v. *Tobey*, 165 Conn. 742, 747, 345 A.2d 21 (1974) (observing that "[g]ross earnings is not a criterion for awards of alimony" and that "[i]t is the net income . . . [that] is available . . . [that] the court must consider"). The requirement that financial orders be based on net amounts also extends to those orders that are based on earning capacity. See *Birkhold* v. *Birkhold*, 343 Conn. 786, 809–10, 276 A.3d 414 (2022).

A trial court's reference to a party's gross income or earning capacity by itself will not, however, trigger a reversal. A well established line of post-*Morris* Appellate Court case law holds that a trial court's failure "to state explicitly that an award for alimony is based on net income . . . does not automatically negate the validity of the award on appeal when there is ample evidence from which the court could have determined

Tilsen *v.* Benson

the parties' net income.'' *Fronsaglia* v. *Fronsaglia*, supra, 202 Conn. App. 783. Although ''support and alimony orders must be based on net income, the proper application of this principle is context specific. . . . [*W*]*e differentiate between an order that is a function of gross income and one that is based on gross income*. . . . [T]he term *based* as used in this context connotes an order that . . . takes into consideration [only] the parties' gross income and not the parties' net income. Consequently, an order that takes cognizance of the parties' disposable incomes may be proper even if it is expressed as a function of the parties' gross earnings.'' (Emphasis added; internal quotation marks omitted.) *Leonova* v. *Leonov*, supra, 201 Conn. App. 300. Applying this ''function'' principle, the Appellate Court ''has overlooked the failure of the trial court to make a finding as to a party's net income . . . . [The Appellate Court has] concluded that such an omission does not compel the conclusion that the court's order was improperly based on gross income if the record indicates that the court considered evidence from which it could determine a party's net income, and it did not state that it had relied on the party's gross earnings to form the basis of its order.''[27] Id.

_____

[27] A review of the cases is instructive given the context specific nature of this inquiry. Compare *Morris* v. *Morris*, supra, 262 Conn. 306–307 (reversal was required when ''the [trial] court affirmatively and expressly stated that it relied on gross income to determine available funds for support consideration,'' despite evidence in record of parties' net income, because trial court ''expressly and affirmatively stated that the [husband] 'has the following *gross* amounts [that] are properly included in his support income consideration' '' (emphasis in original)), *Procaccini* v. *Procaccini*, 157 Conn. App. 804, 808–11, 118 A.3d 112 (2015) (modification of alimony improperly was based on gross income when trial court made findings as to gross income and declined counsel's invitation to make findings as to net income), *Cleary* v. *Cleary*, supra, 103 Conn. App. 803–804 (alimony improperly was based on gross income when only income stated in memorandum was equivalent to gross of husband's income from employment, gambling winnings, and disability benefits, and trial court's response to motion for clarification stated that ''it used the [husband's] gross weekly income as well as his gambling winnings without mention of his $28,100 in receipted gambling

347 Conn. 758       SEPTEMBER, 2023       811

Tilsen *v.* Benson

Ultimately, we understand this line of case law essentially to be one of harmless error, which is consistent with the maxim that we read trial court memoranda of decision to presume that the trial court exercised its discretion in accordance with the governing law. See, e.g., *Hughes* v. *Hughes*, 95 Conn. App. 200, 207–208,

losses as indicated on the parties' 2004 joint income tax return''), and *Ludgin* v. *McGowan*, 64 Conn. App. 355, 358–59, 780 A.2d 198 (2001) (reversal was required when ''it appear[ed] that the court chose not to rely on . . . information'' about net incomes and its ''memorandum of decision [was] devoid of any mention of the parties' net incomes''), with *Fronsaglia* v. *Fronsaglia*, supra, 202 Conn. App. 784–86 (upholding alimony award with reference to gross income despite trial court's failure to ''expressly state that it considered the [husband's] net income'' given ''[the inference] that the court considered the relevant statutory factors and all of the evidence submitted by the parties'' and references in memorandum of decision to financial affidavits that reflected ''total net weekly income''), *Leonova* v. *Leonov*, supra, 201 Conn. App. 300–301 (upholding financial orders that made reference only to gross numbers because trial court ''did not expressly state that it was relying solely on gross earnings in framing its order'' and, instead, stated that it considered all relevant statutes, testimony of parties, and ''the evidence presented, which included evidence of the [husband's] actual net bonus income, including a payroll statement . . . reflecting his most recent annual net bonus payment''), *Langley* v. *Langley*, supra, 137 Conn. App. 602–604 (upholding financial orders when trial court did not state that it relied on gross income or ''that it drafted its financial orders based on the [husband's] gross earning capacity,'' but because it ''had before it evidence of the [husband's] gross and net income and referred to both in its memorandum of decision,'' in particular the financial affidavit, and relied on earning capacity, shown by documentation of husband's business profits and losses, including gross and net income, and his tax returns), *Hughes* v. *Hughes*, 95 Conn. App. 200, 206–207, 895 A.2d 274 (trial court cited, but did not improperly rely on, husband's gross earnings because it noted that they ''demonstrate[d] their scope and variability in order to explain its reasoning for fashioning an order framed as a percentage of the [husband's] gross earnings,'' when remainder of decision considered ''gross and net values of the [husband's] most recent cash bonus,'' financial affidavits, and tax returns that disclosed his ''net disposable income''), cert. denied, 280 Conn. 902, 907 A.2d 90 (2006), and *Kelman* v. *Kelman*, 86 Conn. App. 120, 122–24, 860 A.2d 292 (2004) (reversal was not required because trial court ''never stated . . . that it was relying solely on . . . gross incomes'' and its ''memorandum of decision specifically stated that it was relying on 'all of the relevant information,' including the parties' financial affidavits and their child support guideline worksheets, both of which included the parties' net incomes''), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005).

895 A.2d 274, cert. denied, 280 Conn. 902, 907 A.2d 90 (2006). Put differently, if the trial court's memorandum of decision reasonably can be understood to base the alimony award on net income, we will view the exercise of its discretion accordingly and uphold the alimony award if it is not an abuse of the court's discretion with respect to the net amounts available. See *Greco* v. *Greco*, 82 Conn. App. 768, 773, 847 A.2d 1017 (2004) (concluding that trial court improperly based alimony order on gross income because, although it "did not 'affirmatively and expressly' state that it relied on the parties' gross incomes in determining its alimony order," income amount stated was "equal to the [husband's] gross income as stated in his financial affidavit," alimony amount was "precisely 50 percent of the [husband's] gross income," and alimony and other expenses ordered "far exceeded his available net income," as stated on financial affidavits), aff'd, 275 Conn. 348, 880 A.2d 872 (2005); see also *Birkhold* v. *Birkhold*, supra, 343 Conn. 810 (upholding modified alimony award that was based "not only on the [husband's] *past gross earnings*," but also on his "net earning capacity [of] $250,000, which [was] markedly less than his past gross annual income of $350,000" (emphasis added)).

Thus, we now turn to the record in the present case. The plaintiff accurately observes that the trial court's only specific finding as to the plaintiff's earning capacity is expressed in terms of gross earning capacity, which is consistent with his most recent gross earnings from employment. The memorandum of decision, however, expressly states that the plaintiff's "*net weekly income*, assets, liabilities and expenses are accurately reflected in the plaintiff's financial affidavit." (Emphasis added.) Moreover, the memorandum of decision does not expressly state that the gross amount, rather than the net amount, furnishes the basis for the alimony calculations. Although it would have been better practice for

Tilsen *v.* Benson

the trial court's memorandum of decision to have included an express finding concerning the plaintiff's net earning capacity; see *Birkhold* v. *Birkhold*, supra, 343 Conn. 810; we nevertheless cannot conclude that the exercise of its discretion was based on a misstatement of the law.

The arithmetic underlying the trial court's specific orders in this case also supports application of the presumption that the trial court exercised its discretion in accordance with the governing law. Specifically, the trial court's memorandum of decision states that the plaintiff's gross earning capacity was $202,100, which was consistent with his most recent gross income from employment by the synagogue as reflected on his financial affidavit. His net weekly income on the financial affidavit was $3583, which, as the defendant argues, would be consistent with a net annual earning capacity of approximately $162,000. A $5000 per month alimony award is approximately 37 percent of that net amount, which is not a percentage that—on its face—suggests an abuse of discretion relative to the earning capacity on which it is based.

b

Finally, we consider whether the alimony award is itself an abuse of discretion when viewed in light of the plaintiff's ability to pay. The alimony award is consistent with the trial court's express reliance on the defendant's drastically reduced earning capacity relative to that of the plaintiff, given that, at the time of trial, she was earning only $12 per hour at a part-time job, and the trial court declined to credit Joy's opinion that she had an earning capacity of $55,000 in the legal or nonprofit fields given her inability to secure professional employment after multiple attempts. See *Powell-Ferri* v. *Ferri*, supra, 326 Conn. 465–66 (trial court was permitted to consider husband's "ability to earn additional income"

Tilsen *v.* Benson

and wife's " 'severely limited' " ability to acquire future assets in ordering alimony, while also "award[ing] substantially more of the marital assets to [the wife] including the marital home"). Indeed, the trial court aptly recognized the defendant's contributions to the marriage and to the plaintiff's professional success given her distinct role as the rabbi's wife, which is consistent with the principle that, "[w]hen the disadvantaged spouse's efforts increased the other's earning capacity at the expense of [his or] her own, he or she is entitled to sufficient alimony to ensure the continued enjoyment of [that] standard of living . . . ." (Internal quotation marks omitted.) *Hornung* v. *Hornung*, supra, 323 Conn. 162.

Second, given that the cash assets were split evenly and that the plaintiff received the marital home, 45 percent of the retirement accounts, and 75 percent of the Westview distributions, the trial court's alimony order is not "irreconcilable with the principle that alimony is not designed to punish, but to ensure that the former spouse receives adequate support. . . . [I]t is hornbook law that what a spouse can afford to pay for support and alimony is a material consideration in the court's determination as to what is a proper order . . . ." (Citations omitted; internal quotation marks omitted.) *Greco* v. *Greco*, supra, 275 Conn. 361–62. Compare id., 350, 352–53, 362–63 (it was abuse of discretion to award wife 98.5 percent of marital estate, including shares in husband's business, while ordering weekly alimony, attorney's fees and life insurance coverage, which left husband with annual net income deficit), *Onyilogwu* v. *Onyilogwu*, 217 Conn. App. 647, 655–57, 289 A.3d 1214 (2023) (reversal was required when ten year alimony award was based on temporary pandemic unemployment benefits, the subtraction of which meant that "the court's order requiring the [husband] to pay $1500 per month in alimony would consume most of [his] income," and there was no finding that his earning

Tilsen *v.* Benson

capacity reflected that higher amount), *Valentine* v. *Valentine*, 149 Conn. App. 799, 806–808, 90 A.3d 300 (2014) (financial orders that stripped husband of marital home, required him to pay his and wife's attorney's fees and imposed alimony and child support obligations constituting more than 80 percent of his net income were abuse of discretion in absence of identification of assets that he could use to comply), and *Pellow* v. *Pellow*, supra, 113 Conn. App. 124, 128–29 (financial orders, including periodic alimony award of $4500 per month, were abuse of discretion when husband's obligation amounted to "more than 90 percent of [his] income as determined by the court"), with *M. S.* v. *P. S.*, 203 Conn. App. 377, 391, 248 A.3d 778 (support and vehicle payment orders leaving husband with only 10 percent of weekly net income were not excessive because alimony was limited to period of six years, and husband received "substantial assets in the dissolution" totaling 50 percent of marital estate—including bank accounts, stocks, proceeds from sale of marital home, and foreign real estate—that "he could [have] use[d] to comply with the court's support orders and to sustain his basic welfare," which was consistent with parties' financial practice of using assets to meet their expenses during their marriage), cert. denied, 336 Conn. 952, 251 A.3d 992 (2021), and *Salzbrunn* v. *Salzbrunn*, 155 Conn. App. 305, 318, 109 A.3d 937 (child support and alimony awards that constituted approximately 50 percent of husband's net income were "not confiscatory or blatantly inequitable"), cert. denied, 317 Conn. 902, 114 A.3d 166 (2015).

Finally, the trial court expressly recognized that the parties' financial circumstances might evolve, insofar as it emphasized that the order was subject to modification as to term and amount, unless that claimed modification was to be based on the defendant's increased earnings, which would then have to be $50,000 or more. See *Birkhold* v. *Birkhold*, supra, 343 Conn. 810 (noting

Tilsen *v.* Benson

that trial court expressly provided "a 'second look' " for modified alimony award when husband reached age of sixty-five); cf. *Oudheusden* v. *Oudheusden*, supra, 338 Conn. 776–77 (observing that "nonmodifiable, lifetime alimony awards are strong medicine" in reversing permanent, nonmodifiable award on ground that, "[t]o the extent that the [trial] court did consider" husband's age, health, or earning potential in entering that award, "it could not reasonably have concluded on [the] record that the [husband] would continue to earn, at a minimum, the same income for the rest of his life"). Bearing in mind that the "generally accepted purpose of . . . alimony is to enable a spouse who is disadvantaged through divorce to enjoy a standard of living commensurate with the standard of living during marriage"; (internal quotation marks omitted) *Brody* v. *Brody*, 315 Conn. 300, 313, 105 A.3d 887 (2015); and that this is not an order that "forced [the plaintiff] to the brink of abject poverty by his obligations . . . and then stripped [him] of any means with which to pay them by the disproportionate division of the marital assets"; *Greco* v. *Greco*, supra, 275 Conn. 363; we conclude that the trial court's alimony order, when considered in light of the plaintiff's net earning capacity, was not an abuse of its discretion.

The judgment is affirmed.

In this opinion the other justices concurred.